50 P.3d 461

Patricia H. LORCA–MERONO, Claimant–Appellant,

v.

YOKES WASHINGTON FOODS, INC., dba Yoke's Pac 'N Save, Employer, Idaho State Insurance Fund, Surety, Defendants–Respondents,

and

State of Idaho, Industrial Special Indemnity Fund, Defendant.

No. 27050.

Supreme Court of Idaho, Boise, April 2002 Term.

June 21, 2002.

Elsaesser Jarzabek Anderson Marks & Elliott, Sandpoint, for appellant. Joseph E. Jarzabek argued.

H. James Magnuson, Coeur d'Alene, for respondents.

EISMANN, Justice.

## I. FACTS AND PROCEDURAL HISTORY

On August 10, 1995, 53–year–old Patricia H. Lorca–Merono (Claimant) suffered an industrial accident while employed as a bakery clerk and product demonstrator by Yoke's Pac 'N Save (Employer) in Sandpoint, Idaho. She experienced pain and a popping sensation in her right shoulder while lifting a full

liner out of a garbage can. She reported the incident to her supervisor, and the following day she sought medical care at the emergency room of the Bonner County Community Hospital. The attending physician released her from work, gave her a sling to immobilize her arm, prescribed medications, and referred her to her personal physician Dr. Watkins.

Dr. Watkins saw Claimant on August 15, 1995. He diagnosed her injury as a right rotator cuff tear and continued the conservative treatment initiated by the emergency room physician. Dr. Watkins also referred Claimant to Dr. Slaughter, an orthopedic surgeon, for a consultation.

Dr. Slaughter examined Claimant on September 12, 1995. An x-ray of Claimant's right shoulder showed slight hypertrophic degenerative arthritis of the right acrimonial clavicular joint. Dr. Slaughter diagnosed a possible subluxation of the right shoulder and prescribed physical therapy. Claimant began the therapy on November 15, 1995, and over a period of time it reduced her pain, increased her strength, and increased the range of motion in her shoulder.

Claimant continued seeing Dr. Slaughter, and on January 9, 1995, he noted that she was complaining of neck pain, headaches, and limitations in the range of motion of her right shoulder. He further noted an inconsistent muscle weakness in her right arm and right grip, suggesting that there was no clear-cut organic problem. Dr. Slaughter indicated that he could do nothing further for Claimant and recommended that she be evaluated by a panel.

On January 11, 1996, Dr. Watkins had x-rays taken of Claimant's cervical spine, and they showed moderate hypertrophic degenerative arthritis and suspected degenerative disc disease at C5-6. Dr. Watkins diagnosed Claimant as suffering cervical and shoulder strains from her industrial accident, and he attributed her current symptoms to the industrial accident. He released Claimant to work with restrictions that she not lift more than twenty pounds and not lift anything overhead.

Employer offered Claimant a position as product demonstrator, beginning on March 3, 1996. She did not accept that position because of her involvement in her father's funeral and the preparation of her Seattle home for sale. She also stated that because of her shoulder pain, she could not drive the thirty-seven miles required to commute to work from her new home near Bonners Ferry, Idaho.

The Idaho State Insurance Fund (Surety), Employer's surety, requested that Claimant submit to an independent medical examination by Dr. Linder, an orthopedic surgeon, and Dr. Marks, a neurologist. They conducted that examination on March 14, 1996. In their written report prepared on the same day, they diagnosed a cervical strain syndrome, with some minor residual symptoms which they thought were primarily from Claimant's right shoulder, and a probable right shoulder rotator cuff tear or significant impingement syndrome. They stated that in their opinions those medical conditions were caused by the industrial accident and that Claimant was limited to sedentary, desk, or similar-type work. They also recommended that Claimant have an MRI of her right shoulder.

That MRI was done later the same day. It showed a three-millimeter, lateral acromial spur, with the potential for impingement, especially with abduction, but no evidence of a rotator cuff tendon tear. Dr. Linder reviewed the MRI report and dictated a supplement to the written report in which he stated that Claimant needed a subacromial decompression of the right shoulder and recommended that she be referred to an orthopedic surgeon. He also stated that in his opinion, this condition was caused by the industrial accident. On April 23, 1996, Dr. Watkins referred Claimant to Dr. Kody, an orthopedic surgeon in Spokane, Washington.

Dr. Kody first examined Claimant on May 17, 1996. He diagnosed her as having impingement syndrome and possibly a rotator cuff tear. He prescribed an anti-inflammatory medication, which had limited effect. During the time he treated her, he also gave her two cortisone injections in her right shoulder. The first one provided considera-

ble short-term relief, but the second was not as successful.

At Surety's request, Drs. Linder and Marks conducted a second independent medical examination of Claimant on November 14, 1996. That examination revealed atrophy of Claimant's upper right arm and increased loss of motion in her right shoulder, which they characterized as a significant deterioration in her condition. Drs. Linder and Marks concluded that Claimant had an industrially related impingement syndrome of her right shoulder and that she was not fixed and stable. They recommended a subacromial decompression of her right shoulder. On December 4, 1996, Dr. Watkins wrote to Surety requesting that Claimant's case be reopened.

On February 16, 1997, Dr. Kody performed an arthroscopic subacromial decompression of Claimant's right shoulder. After the surgery, he prescribed physical therapy and indicated that Claimant could return to light duty work on June 1, 1997. She received therapy from April 29 to June 2, 1997.

In a letter dated May 8, 1997, Employer offered Claimant work as a product facer and customer service greeter beginning on June 2, 1997. Dr. Kody approved her performing that type of work. Claimant did not respond to the offer. She did, however, work for the Migrant Council in Bonners Ferry from May 24, 1997, until July 15, 1997, where she taught English to migrant pre-school children. She was laid off due to lack of enrollment.

On June 13, 1997, Dr. Kody examined Claimant and noted that her shoulder pain was gone and that she had lost some range of motion in her right shoulder. He stated that he expected her range of motion to become normal over time and that she was approaching medical stability. He recommended that she continue with her home exercise program, and he released her to light duty, with a 10 pound lifting and carrying restriction and no repetitive overhead activity for at least three months. He also recommended an MRI to determine her permanent partial impairment. Based upon Dr. Kody's report that Claimant could return to work, Surety stopped paying time loss benefits as of June 13, 1997.

At Surety's request, Drs. Linder and Marks again examined Claimant on June 13, 1997. They concluded that she was fixed and stable and assigned a permanent partial impairment rating of six percent of the right upper extremity at the shoulder level, due to restriction in range of motion and residual weakness of her right shoulder.

Dr. Kody again saw Claimant on August 18, 1997. In a letter to Dr. Watkins dated the same day, he noted that Claimant was now experiencing pain down her right arm to her fingers, including some numbness, and that x-rays showed C5–6 degeneration. He recommended that her claim be reopened and that an MRI be conducted to determine if she had disc degeneration or ostephytic spurring pushing on her right C6 nerve.

On October 13, 1997, Dr. Watkins notified Surety that Claimant was having radicular symptoms in her right arm that were indicative of nerve root compression at C6, with a strong implication of a herniated disc at C5–6. He opined that, although Claimant had preexisting cervical osteoarthritis, the cervical strain she suffered in the industrial accident almost certainly caused the disc herniation. He believed that her symptoms from the disc herniation simply did not become evident until her right shoulder was repaired. He noted that an MRI was necessary and that Claimant would very likely require surgery.

At Surety's request, Dr. Linder and Dr. Jessen, a neurologist, examined Claimant on September 28, 1998, and issued a written report the same day. They emphasized that a cervical MRI done on Claimant in 1993 to diagnose an ear problem showed degenerative changes primarily at the C5–6 level with anterior spurring and mild disc bulging subarachnoid space displacing the cord posteriorly. They noted that the 1993 MRI report stated that the condition might affect the left C6 nerve root and that at that time Claimant had been experiencing left arm symptoms. They concluded that Claimant's symptoms suggested a developing C6 radiculopathy which was not related to the industrial acci-

dent. They summarized their reasoning as follows:

A lifting injury of this sort is not consistent with bringing about a cervical disc herniation, likewise, records including an MRI scan done some two years prior to the industrial injury indicate that Ms. Lorca Merono had a displaced disc at the C5–6 level already displacing the cervical cord. It is felt her cervical and possible radicular symptoms relate to the underlying degenerative disc disease and natural progression that are totally unrelated, and totally unaffected by the August 10, 1995 injury.

Finally, they stated that in their opinions Claimant's permanent partial impairment rating of 6% from the industrial accident was still accurate and that her industrial injury was fixed and stable. Dr. Kody initially concurred with Drs. Linder and Jessen.

On October 5, 1998, Claimant had a cervical MRI conducted at her own expense. The MRI was interpreted to show, among other things, disc herniation at C5–6. On January 12, 1999, Dr. Hahn, a neurosurgeon, saw Claimant at Dr. Kody's request. Dr. Hahn recommended nerve conduction and EMG studies of both arms and a cervical myelogram/CT scan. The myelogram/CT scan was conducted on February 9, 1999, and the nerve conduction and EMG studies were conducted the following day. Based upon the results of the myelogram/CT scan, Dr. Hahn recommended an anterior cervical discectomy and interbody fusion at C5–6. The nerve conduction and EMG studies were normal.

Claimant filed her complaint on August 15, 1997. The evidentiary hearing on this matter was held on September 1, 1999, before a referee assigned by the Industrial Commission. The primary issue was whether Claimant's cervical condition, the disc herniation at C5–6, was caused by her industrial accident. In support of her position, Claimant submitted the post-hearing deposition of Dr. Hahn, who testified that in her opinion the industrial accident aggravated Claimant's preexisting cervical disc disease. The Employer/Surety countered with the post-hearing deposition of Dr. Linder, who testified that in his opinion Claimant's herniated disc at C5–6 was unrelated to the industrial accident. The hearing examiner issued proposed findings of fact and conclusions of law on May 24, 2000. He concluded that the industrial accident injured Claimant's right shoulder and aggravated her preexisting degenerative cervical condition. The Industrial Commission did not adopt the referee's proposed findings of fact and conclusions of law. On July 29, 2000, it issued its own findings of fact, conclusions of law, and order. It found that Claimant suffered a cervical strain as a result of the industrial accident, which subsequently resolved itself, but it did not find that the industrial accident caused or aggravated her preexisting cervical disc disease. As a result, it found that Claimant had failed to prove that she was totally and permanently disabled under the odd-lot doctrine. It found that she was 20% disabled, inclusive of impairment.

On August 4, 2000, Claimant filed a second complaint for compensation based upon the same industrial accident. Employer/Surety moved to dismiss the second complaint on the grounds that it did not allege a change in condition and that the claim was barred by res judicata. On October 31, 2000, the Commission denied the motion to dismiss on the ground that it was premature because the actual issues raised in the second complaint could not be known until Claimant filed an application for a hearing.

On August 8, 2000, Claimant filed a motion for reconsideration. In her supporting brief she argued that the post-hearing deposition of Dr. Linder was inadmissible, that the Commission should have rejected Dr. Linder's opinions, that the Commission should have awarded the Claimant attorney fees, and that it should not have determined her permanent disability until after she received the surgery recommended by Dr. Hahn. On October 11, 2000, the Commission denied Claimant's motion for reconsideration. Claimant then appealed to this Court.

## II. ANALYSIS

When this Court reviews a decision of the Industrial Commission, it exercises free review over questions of law, but reviews questions of fact only to determine

whether substantial and competent evidence supports the Commission's findings. *Gooby v. Lake Shore Mgmt. Co.*, 136 Idaho 79, 29 P.3d 390 (2001). Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion. *Id.* Because the Commission is the fact finder, its conclusions on the credibility and weight of the evidence will not be disturbed on appeal unless they are clearly erroneous. *Id.* This Court does not weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented. *Id.* Whether a claimant has an impairment and the degree of permanent disability resulting from an industrial injury are questions of fact. *Id.*

### A. Did the Industrial Commission have the authority to make its own determination as to the weight to be given expert medical testimony?

■ The primary issue at the hearing was whether the industrial accident aggravated Claimant's preexisting degenerative cervical condition causing her herniated disc at C5–6. Dr. Hahn testified that it did, and Dr. Linder testified that it did not. In addition, the medical records of Drs. Kody and Watkins indicated that they agreed with Dr. Hahn.[1] The referee found the opinions of Drs. Watkins, Kody, and Hahn to be persuasive and concluded that the industrial accident aggravated Claimant's preexisting degenerative cervical condition. The Industrial Commission, however, found the opinion of Dr. Linder to be more persuasive. It also noted that Dr. Kody initially agreed with Dr. Linder, but later changed his position without explanation. The Commission concluded that Claimant had failed to prove that the industrial accident aggravated her preexisting condition. Claimant argues that as a matter of law the Commission could not simply reject findings of fact proposed by the referee.

■ The findings of fact made by the referee were merely recommendations to the Industrial Commission. Upon reviewing those findings, it could either adopt them or enter its own findings. IDAHO CODE §§ 72–506(2) & 72–717 (1999).[2] The Commission need not explain why it did not adopt certain findings recommended by the referee. The Industrial Commission, as the factfinder, is free to determine the weight to be given to the testimony of a medical expert. *Eacret v. Clearwater Forest Indus., Inc.*, 136 Idaho 733, 40 P.3d 91 (2002). The Commission is not bound to accept the opinion of the treating physician over that of a physician who merely examined the claimant for the pending litigation. *Gooby v. Lake Shore Mgmt. Co.*, 136 Idaho 79, 29 P.3d 390 (2001). We will not disturb the Commission's conclusions as to the weight and credibility of expert testimony unless such conclusions are clearly erroneous. *Eacret v. Clearwater For-*

1. On November 13, 1998, Surety sent Dr. Kody a letter enclosing a copy of the September 28, 1998, report of Drs. Linder and Jessen in which they stated that in their opinion Claimant's C6 radiculopathy was unrelated to the industrial accident. The letter asked Dr. Kody whether he concurred with that opinion. On November 17, 1996, Dr. Kody wrote "I concur" on the letter and returned it to Surety. On August 20, 1999, however, Dr. Kody wrote a note in which he stated, without any further explanation, "I agree with Dr Hahns eval." In his letter to Surety dated October 12, 1997, in which he asked Surety to reopen Claimant's case, Dr. Watkins stated, "While she does have Cervical Osteo Arthritis which developed prior to her injury it is almost certain that the injury sustained caused her Disc Herniation."

2. These two statutes provide as follows:

 **72–506. Acts of commission or reference— Hearing officers.—** (1) Any investigation, inquiry or hearing which the commission has power to undertake or hold may be undertaken or held by or before any member thereof or any hearing officer, referee or examiner appointed by the commission for that purpose.

 (2) Every finding, order, decision or award made by any member, hearing officer, referee, or examiner pursuant to such investigation, inquiry or hearing, when approved and confirmed by the commission, and ordered filed in its office, shall be deemed to be the finding, order, decision or award of the commission.

 **72–717. Effect of decision by one member or assigned officer—Claim for review.—** If the matter has been assigned for hearing by a member, hearing officer, referee, or examiner, the record of such hearing, together with the recommended findings and determination, shall be submitted to the commission for its review and decision.

*est Indus., Inc.*, 136 Idaho 733, 40 P.3d 91 (2002).

Citing *Darner v. Southeast Idaho In Home Services*, 122 Idaho 897, 841 P.2d 427 (1992), Claimant argues that the Commission erroneously rejected her testimony. Because the Commission did not observe her demeanor while testifying, nor did it point out any inaccuracies in her testimony, it could not disregard her testimony.

In its findings, the Commission noted that the referee found Claimant to be a credible witness, and it did not question her credibility in its findings of fact. The Commission based its findings upon the weight it gave to Dr. Linder's opinion regarding the causation of Claimant's cervical condition. In arriving at his opinion, Dr. Linder did not question Claimant's credibility. He did not reject her recitation of symptoms or reported history. He based his opinion primarily upon the pre-accident MRI and the mechanism of her

injury. Therefore, the Industrial Commission had the authority to determine the weight to be given the testimony of medical experts and to give more weight to the testimony of Dr. Linder. By doing so, it was not rejecting Claimant's testimony as not credible.

## B. Did the Industrial Commission err in considering the post-hearing deposition testimony of Dr. Linder?

■ Claimant argues that the Industrial Commission erred in considering the post-hearing deposition testimony of Dr. Linder for three reasons. First, she argues that Dr. Linder's deposition testimony could not have been considered because the deposition was not offered and admitted as an exhibit. Rule X(E) of the Judicial Rules of Practice and Procedure Under the Idaho Workers' Compensation Law [3] provides:

---

3. The full text of the rule is as follows:

(A) **Presiding Officers**—Hearings are held before one or more Commissioners or a Referee appointed by the Commission. The presiding officer in each case is designated by the Commission.

(B) **Stipulations**—The parties may stipulate to the facts of any case in writing and the Commission may make its order or award thereon.

(C) **Exhibits**—Ten (10) days prior to a hearing, each party shall serve upon all other parties complete, legible, and accurate copies of all exhibits to be offered into evidence at hearing, including but not limited to medical records, arranged in chronological order within each exhibit and shall file Notice of Service thereof with the Commission. In the event that the existence of a proposed exhibit is discovered less than 10 days before the date of hearing, the party discovering the same shall immediately notify all other parties of the existence of the exhibit, serve a complete, legible and accurate copy of the exhibit upon all other parties and file with the Industrial Commission a Notice of Service of such proposed exhibit.

(D) **Depositions—Generally**—The testimony of any witness or witnesses may be presented by deposition prior to the conclusion of the hearing, provided that the party offering the deposition testimony provides reasonable notice prior to the taking of the deposition that the deposition may be used for testimonial purposes. The deposition testimony of any witness also may be presented prior to the conclusion of the hearing by agreement of the parties. Absent such notice or agreement, a deposition may be used only to the extent allowed by the Idaho Rules of Civil Procedure.

(E) **Post-hearing Depositions**—At the conclusion of a hearing, unless the parties agree to a

shorter time, the record shall remain open for the submission of deposition testimony of physicians and vocational expert witnesses. "Physician" as used in this rule means (1) a "physician" as defined by Section 72–102(21), Idaho Code; or (2) a practitioner of medicine or any of the healing arts or sciences duly licensed as such in another state. Notice of all depositions to be taken pursuant to this subsection must be filed with the Commission and served on all other parties not later than 10 days prior to the hearing. A party who has given notice of a deposition under this subsection may vacate the deposition only by serving reasonable written notice upon all other parties and giving them an opportunity to respond. Any party who objects to vacating a post-hearing deposition must serve reasonable written notice of its objection upon all other parties. If any party serves a notice of objection as provided herein, the deposition shall not be vacated; provided, however, that the service of a notice of objection shall constitute a certification that the party or parties objecting to vacating the deposition will bear the costs of the deposition. All depositions to be submitted on behalf of a claimant must be taken by no later than 14 days after the conclusion of the hearing; all depositions to be submitted on behalf of a defendant must be taken by no later than 28 days after the conclusion of the hearing. The Commission shall have the power to alter the time limits within which to notice or take post-hearing depositions upon motion showing good cause for such modification; provided, however, that any stipulation or motion to enlarge the period for post-hearing depositions must be submitted to the Commission for its approval prior to the expiration of the original period and must set

At the conclusion of a hearing, unless the parties agree to a shorter time, the record shall remain open for the submission of deposition testimony of physicians and vocational expert witnesses.... All depositions to be submitted on behalf of a claimant must be taken by no later than 14 days after the conclusion of the hearing; all depositions to be submitted on behalf of a defendant must be taken by no later than 28 days after the conclusion of the hearing. The rule does not require that a post-hearing deposition be marked and offered into evidence. Indeed, Claimant did not mark the post-hearing deposition of her witness Dr. Hahn as an exhibit and offer it into evidence, nor did she list that deposition as one of her exhibits. Subsection (C) of Rule X requires that, ten days before the hearing, each party serve upon the other copies of all exhibits to be offered at the hearing. A party obviously cannot serve ten days before the hearing a copy of a deposition to be taken after the hearing. Therefore, Employer/Surety was not required to mark Dr. Linder's deposition as an exhibit and offer it into evidence. Rule X(D) provides that testimony of a witness may be presented by deposition and Rule X(E) provides that the record remains open following the hearing for the presentation of post-hearing deposition testimony of a physician or vocational expert witness. That is the procedure followed by both parties in this case, and it complied with Rule X.

Claimant next argues that Dr. Linder's deposition testimony should have been excluded because Dr. Linder could not insure that his testimony was based upon records he had reviewed before the hearing. Dr. Linder examined Claimant on March 14, 1996, on November 14, 1996, on June 13, 1997, and on September 28, 1998. When cross-examined at his deposition taken on December 7, 1999, Dr. Linder testified that he did not have copies of the medical records he had reviewed prior to these examinations because they were retained by the business that had retained him to perform the examinations. The day before his deposition, he reviewed some medical records that had been provided by Employer/Surety's counsel. When reviewing those records, he testified that he focused on his own work and skimmed the other records, particularly the orthopedic and neurologic reports. Claimant's counsel asked him to identify the particular records he had before each of his examinations of Claimant, and Dr. Linder stated that he was unable to do so. Claimant's counsel then objected to Dr. Linder's testimony because there was no showing that his opinion was based solely upon information provided him before the hearing. Employer/Surety's counsel responded by stating that the medical records provided to Dr. Linder were simply a complete set of Claimant's medical records that were prepared and disclosed prior to the hearing, and he offered Claimant's counsel an opportunity to examine them and match them with records admitted during the hearing. Claimant's counsel declined to do so.

Claimant bases her objection upon Rule X(E), which provides, "[T]he evidence presented by post-hearing deposition shall be evidence known by or available to the party at the time of the hearing and shall not include evidence developed, discovered, or manufactured following the hearing." She argues that if Dr. Linder formed an opinion

forth with specificity reasonable grounds for such enlargement and the extent of the enlargement sought. Unless the Commission, for good cause shown, shall otherwise order, at or before the hearing, the evidence presented by post-hearing deposition shall be evidence known by or available to the party at the time of the hearing and shall not include evidence developed, discovered, or manufactured following the hearing.

(F) **Evidence**—The filing of a document does not signify its receipt in evidence, and only those documents which have been received in evidence shall be included in the record of proceedings of the case.

(G) **Medical Reports**—Any medical report(s) existing prior to the time of hearing on a form prescribed by the Commission, or in narrative form, signed and dated by a physician, or otherwise sufficiently authenticated, shall be admissible in evidence at the hearing insofar as it purports to present one or more of the following: the history, findings on examination, diagnosis, treatment, prognosis, claimant's physical and/or work limitations, the physician's opinion as to causation, the physician's opinion of the claimant's permanent physical impairment, or the physician's apportionment of impairment. The fact that such report(s) constitutes hearsay shall not be grounds for its exclusion from evidence.

**454**

based upon documents that he had not seen prior to the hearing, then his opinion would have been developed after the hearing in violation of the rule. The Commission overruled Claimant's objection to Dr. Linder's deposition testimony on the grounds that Claimant had failed to identify any document provided to Dr. Linder after the hearing that was not known at the time of the hearing, that on direct examination Dr. Linder essentially repeated the diagnoses and conclusions contained in his medical reports that had been admitted into evidence at the hearing, and that the majority of his deposition testimony was developed during cross-examination by Claimant's counsel. On appeal, Claimant has not identified any diagnosis or opinion rendered by Dr. Linder during his deposition testimony that differed from the diagnoses and opinions contained in his earlier reports. The Commission did not err in overruling Claimant's objection to the deposition testimony of Dr. Linder.

 Finally, Claimant argues that the Commission should have rejected the testimony of Dr. Linder as being inherently unbelievable. Dr. Linder explained his belief that the industrial accident could not have caused Claimant's ruptured disc as follows:

Q. Your second diagnosis [in the report dated September 28, 1998,] is, "Question of herniated C5–6 disc with local degenerative disc disease, pre-existing and unrelated to the injury under review."

What was the basis of your conclusion that it was pre-existing and unrelated to the industrial injury under review?

A. The x-ray and related findings indicated she had degenerative disc disease, which is a long-term condition that doesn't come about because of one isolated event.

The other part of the answer is there was no history of any neck injury. She had reported a lifting type of injury. And you don't lift with your neck, nor do the muscles you use affect the neck. So the neck injury, not denying that she had this diagnosis, there's not a physiologic way of relating it to the accident that this claim was about.

Q. Looking at the top of page 7 of your discussion, you state, "A lifting injury of this sort is not consistent with bringing about a cervical disc herniation. Likewise, records, including an MRI scan done some two years prior to the industrial injury, indicate that Ms. Lorca Merono had a displaced disc at C5–6 level already displacing the cervical core."

What type of activity—assuming that she had that degenerative disc disease, what type of activity would she do that would maybe aggravate that in some sort of industrial or other setting?

A. Basically just the activities of life. Degenerative disc disease is a wear and tear phenomenon that we all get to a greater or lesser extent, and the normal course of this condition is one of progressive worsening over time.

In terms of specific things aggravating it—which to my knowledge did not occur—had she received some blow to the top of the head, like a falling object striking the top of the head, or had she been in some substantially violent accident, such as a motor vehicle accident or train wreck or something like this where there was really a violent jerking back and forth of the neck, that potentially could aggravate it.

Q. But a lifting disease [sic] would not result in physical strain on that portion of the body?

A. No. I guess the other thing I could mention is if the nature of her employment or personal habits were such that she was doing a great deal of work overhead so that her neck was extended a good part of the time, that could potentially aggravate this, too. But as far as I know, these things did not apply to this particular patient.

. . . . [On cross-examination.]

Q. Are you here today to testify that Dr. Hahn's opinion is wrong?

A. Concerning the need for surgery, I have no disagreement whatsoever. Concerning the causation, yes, I do disagree in respect to Dr. Hahn.

Q. And tell me the fact or facts that you base that disagreement on?

A. I have already explained why I cannot relate the two. Lifting does not strain the cervical spine. You don't lift with your neck. And to the best of my knowledge, there was no part of her injury that included any axial—meaning top to bottom—blow to the neck or any violent motions of the neck.

Dr. Linder had previously testified that when he first examined Claimant, he diagnosed her as having a cervical strain syndrome. He explained that diagnosis as follows:

Q. And as a result of that evaluation [on March 14, 1996], one of your diagnoses was, "Cervical strain syndrome with some minor residual symptoms which likely are primarily from the right shoulder"?

A. Yes, sir.

Q. What do you mean by "cervical strain syndrome"?

A. A strain is a stretching of soft tissues, much like you stretch a piece of meat, but stretched to the point that they don't go back to their normal length. And that's basically what a strain is.

A strain syndrome just is an indication of the condition of associated discomfort associated with that type of injury.

Q. You noted [in the report dated March 14, 1996,] that as far as her cervical complaints, you didn't feel that she needed any further treatment at that time?

A. Correct.

Q. And what was the basis for your conclusion on that?

A. I felt her symptoms were primarily coming from her right shoulder, where there was evidence of a physical problem.

Q. Did your orthopedic examination reveal anything with regard to a cervical condition at that time?

A. No, sir. Both the orthopedic examination in regards to the cervical area as well as the neurologic exams were once again normal.

Q. And did you feel she had any impairment from any cervical injury?

A. No, sir, I did not.

Q. And why was that?

A. She had neither symptoms nor objective findings that would support a finding of an impairment.

Claimant argues that Dr. Linder's testimony is not believable because, "If her lifting could cause a cervical strain it could cause cervical disc herniation."

On cross-examination, Claimant did not ask Dr. Linder to explain this alleged inconsistency in his diagnoses. Claimant simply asks us to substitute our opinion for the Commission's regarding the weight to be given Dr. Linder's testimony and to reject it. We will not disturb on appeal the Commission's conclusions as to the weight and credibility of the evidence unless they are clearly erroneous. *Reiher v. American Fine Foods,* 126 Idaho 58, 878 P.2d 757 (1994). In this case, the Commission's conclusions as to the weight and credibility of the testimony of Dr. Linder are not clearly erroneous.

**C. Did the Industrial Commission err in failing to award Claimant attorney fees?**

In her complaint, Claimant requested an award of attorney's fees and costs. The Commission denied her request, stating, "The evidence in this case indicates SIF paid medical and time loss benefits relative to Claimant's right shoulder injury. Claimant is not entitled to further benefits. Therefore, Commission finds Claimant is not entitled to attorney's fees in this case." In her motion for reconsideration, Claimant asked the Commission to reconsider its denial of her request for attorney fees. Claimant argued that the benefit and payments records submitted by the Employer/Surety at the hearing showed that the Surety did not pay benefits within a reasonable time. The Commission again declined to award attorney fees, stating, "Claimant has not shown that SIF contested the claim unreasonably or failed to pay within a reasonable time."

Attorney fees are awardable under Idaho Code § 72–804,[4] if the employer/surety (a) contested a claim without a reasonable ground; or (b) neglected or refused to pay the compensation within a reasonable time after receipt of a written claim; or (c) discontinued payment of compensation without reasonable grounds. Whether or not grounds exist for awarding a claimant attorney fees under the statute is a factual determination that rests with the Industrial Commission. *Gooby v. Lake Shore Mgmt. Co.,* 136 Idaho 79, 29 P.3d 390 (2001). The Commission's decision regarding the awarding of attorney fees will be upheld if it is based upon substantial, competent evidence. *Id.*

Claimant does not contend that the Employer/Surety, without reasonable ground, either contested her claim for compensation or discontinued payment of compensation. She alleges that the Employer/Surety neglected or refused to pay the compensation provided by law within a reasonable time after receipt of a written claim for compensation.

Claimant first argues that temporary total disability (TTD) benefits were not paid timely during the period from August 8, 1996, through June 13, 1997. Surety began paying TTD benefits on August 11, 1995. At issue are TTD benefits for the periods of August 8, 1996, through November 13, 1996, and June 1 through 13, 1997. Surety did not pay those benefits until August 4, 1998. For the period from November 14, 1996, through May 31, 1997, Surety paid TTD benefits every two weeks.

With respect to the period from August 8, 1996, through November 13, 1996, the findings of fact show that on July 1, 1996, Claimant "had passed the state examination for a word processing generalist, and that she was seeking employment through the Bonners Ferry Job Service Office." The findings also state that on December 4, 1996, her physician wrote Surety asking that her case be reopened. Apparently, Claimant's case was closed and then reopened when her condition worsened.

With respect to the period from June 1 through 13, 1997, the record reflects that by letter dated May 8, 1997, Employer offered Claimant a job and that her physician Dr. Kody had approved the job site evaluation for that job. Claimant did not respond to that offer, but she did obtain full-time employment from May 24, 1997, until July 15, 1997, with the Migrant Council in Bonners Ferry.

On July 13, 1998, Claimant filed a motion seeking an expedited hearing regarding the payment of the unpaid TTD benefits. Surety paid those benefits on August 4, 1998. The Industrial Commission's finding that Surety paid the benefits within a reasonable time after receipt of a written claim for compensation is supported by substantial, competent evidence.

Claimant next argues that Surety did not timely pay certain medical expenses owing to the Boundary County Community Hospital. The alleged late payments, as shown on the Employer/Surety benefit and payment records, were as follows: $19.00 paid on August 3, 1997, for services provided on September 12, 1995; $445.85 paid during the period from September 7, 1997, through April 26, 1998,[5] for services provided on May 1, 1997; and $14.80 paid on August 10, 1997, for services rendered on June 2, 1997. The record does not reflect when written claims for payment of these sums were submitted to Sure-

---

4. The statute provides:

 If the commission or any court before whom any proceedings are brought under this law determines that the employer or his surety contested a claim for compensation made by an injured employee or dependent of a deceased employee without reasonable ground, or that an employer or his surety neglected or refused within a reasonable time after receipt of a written claim for compensation to pay to the injured employee or his dependents the compensation provided by law, or without reasonable grounds discontinued payment of compensation as provided by law

 justly due and owing to the employee· or his dependents, the employer shall pay reasonable attorney fees in addition to the compensation provided by this law. In all such cases the fees of attorneys employed by injured employees or their dependents shall be fixed by the commission.

5. The entry states the date paid as "09/07/97–04/26/97." The year of the ending date was probably a typographical error. There is no showing as to the amounts or dates of the individual payments made during this period.

ty. The Industrial Commission's finding that Surety paid the benefits within a reasonable time after receipt of a written claim for compensation is supported by substantial, competent evidence.

 Finally, Claimant argues that Surety knew that she had an impairment rating based upon the examination of Drs. Linder and Marks on June 13, 1997, and that Surety did not pay impairment benefits until September 4, 1997, twenty days after Claimant filed her complaint. The Industrial Commission's finding that Surety paid the benefits within a reasonable time after receipt of a written claim for compensation is supported by substantial, competent evidence.

**D. Did the Industrial Commission err in failing to retain jurisdiction over the issue of Claimant's permanent disability?**

Claimant contends that the Industrial Commission should have retained jurisdiction over her case until she received the surgery recommended by Dr. Hahn. She argues that her medical condition cannot be fixed and stable until she has that surgery.

In *Reynolds v. Browning Ferris Industries,* 113 Idaho 965, 751 P.2d 113 (1988), we held that where a claimant's impairment is progressive and cannot be adequately determined for the purpose of establishing a permanent disability rating, it is entirely appropriate for the Industrial Commission to retain jurisdiction until such time as the claimant's condition is nonprogressive. In this case, however, Claimant's impairment resulting from her industrial accident was stable and nonprogressive. Therefore, the Commission did not err in refusing to retain jurisdiction over this case.

**D. Is Employer/Surety entitled to an award of attorney fees on appeal?**

Employer/Surety requests an award of attorney fees on appeal pursuant to Idaho Appellate Rule 11.1. That rule provides that an attorney's signature on a notice of appeal constitutes

a certificate that the attorney or party has read the notice of appeal ...; that to the

best of the signer's knowledge, information, and belief after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Although it is a close case, we do not find that Claimant's appeal was brought in bad faith or for an improper purpose. Therefore, we decline to award attorney fees under Rule 11.1. *Rivas v. K.C. Logging,* 134 Idaho 603, 7 P.3d 212 (2000).

**III. CONCLUSION**

We affirm the order of the Industrial Commission. We award costs on appeal, but not attorney fees, to the Employer/Surety.

Chief Justice TROUT, and Justices SCHROEDER, WALTERS and KIDWELL concur.