# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 42521

TODD LAWRENCE HAMILTON, Deceased, )
)
    Claimant-Respondent, )
)
v. )
)
ALPHA SERVICES, LLC, Employer, and )
DALLAS NATIONAL INSURANCE CO., )
Surety, )
)
    Defendants-Appellants. )
_____ )

Boise, May 2015 Term

2015 Opinion No. 53

Filed: June 22, 2015

Stephen W. Kenyon, Clerk

---

Appeal from the Idaho Industrial Commission.

The decision of the Industrial Commission is affirmed.

Bowen & Bailey, LLP, Boise, for appellants. Nathan T. Gamel argued.

Starr Kelso, Coeur d'Alene, argued for respondent.

---

J. JONES, Justice

Todd Hamilton died in an automobile accident while employed by Alpha Services, LLC. The Idaho Industrial Commission found that the accident arose out of and in the course of Hamilton's employment and determined that Hamilton's widow and two children are entitled to statutory death benefits under Idaho's worker's compensation laws. Alpha and its surety, Dallas National Insurance Company, argue on appeal that the Commission's decision is not supported by substantial and competent evidence. We affirm.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

Todd Hamilton was hired in September of 2011 by Alpha Services, LLC, to work at its logging operation in Wyoming. The operation was located on United States Forest Service land in southern Wyoming approximately forty miles southwest of Laramie and twenty-eight miles northeast of Walden, Colorado, spanning Wyoming Highway 230. The active logging site was

1

located about three-quarters of a mile along a dirt road extending west from Highway 230. Approximately one hundred feet south on Highway 230, another dirt road extends east to an area, roughly a hundred feet from the highway, in which Alpha placed a shipping container to store supplies and equipment. Hamilton was hired primarily to operate logging equipment at the Wyoming site, but was also required to perform services as a mechanic. He moved to Wyoming from his home in Rathdrum, Idaho, to begin work on September 17, 2011, and rented a house on Highway 230 about a mile north of the road leading to the active logging site. Though Alpha provided Hamilton with an advance to help him secure housing, it did not directly compensate Hamilton for his housing and travel expenses.

On December 7, 2011, Hamilton and Leodegardio Cortes de la Cruz ("Leo") were to run back-to-back shifts on the same piece of logging equipment. Leo had worked at the Wyoming site before Hamilton was hired, but was returning there to begin work on December 7 after having worked for Alpha at another logging site. On December 6, Hamilton and Leo discussed by telephone how they would coordinate the double shift. In consultation with Robert Wade Zaharie, Hamilton's supervisor and Alpha's co-owner, they determined that Hamilton would work a morning shift, from two or three to noon, when Leo would begin his afternoon shift.

Hamilton and Leo also discussed how they would share use of the company vehicles. Alpha had three company trucks available at the Wyoming site: a blue Dodge service truck, a white Dodge service truck, and a white Mazda pickup. The service trucks, but not the Mazda, were equipped with a large number of tools for repair and maintenance of the logging equipment. Because of its fuel efficiency, the Mazda was used primarily to retrieve parts from Laramie and elsewhere. Alpha required that service trucks be available for use at the active logging site and prohibited the use of any company vehicles for personal errands. However, Hamilton was permitted to drive the service truck from his rental home to work and back, as long as it could be retrieved by anyone who might need it. Hamilton used the blue service truck during his time with Alpha. Leo had used the same truck when he worked at the Wyoming site. According to Leo, he and Hamilton addressed the use of the blue service truck in their conversation on December 6. A private investigative report submitted as an exhibit by Alpha attributes the following input to Leo:

Mr. Hamilton and Leo were planning to have a service truck at all times at the job site. [Leo] believes that he and Mr. Hamilton were going to trade trucks at some point. [Leo] stated that the service truck has all the tools so it would be needed at the job site. Since

2

this would be their first day working the same job, however, separate shifts, they were attempting to work out the details about who would have what truck and at what time. Leo later testified that he and Hamilton "were going to see how it was going to work," and were planning to discuss switching trucks at some point, but had no arrangement to meet on December 7 to do so. Leo also claimed that there was no immediate need to switch trucks because he had the white service truck available to him.[1]

At around three on the morning of December 7, Hamilton began his shift. At around 6:30 a.m., Hamilton woke Zaharie to tell him that a hydraulic cylinder on the piece of equipment he was operating was leaking. After Hamilton and another employee removed the cylinder, Zaharie took the part to Laramie to be repaired. Zaharie returned with the repaired cylinder at around 11:30 a.m., and Hamilton and another employee reinstalled the part. At about noon, Leo began his shift, and Hamilton left the active logging site in the blue service truck.

There is no evidence concerning Hamilton's activities between noon and 2:00 p.m. At 2:05 p.m., Hamilton called his wife, Tawni, in Rathdrum, Idaho.[2] According to Tawni, Hamilton told her he had worked an early shift, was tired, felt ill, was frustrated that the logging equipment was malfunctioning, and was driving to purchase groceries. The nearest grocery store was roughly thirty miles away in Walden, Colorado. Though Hamilton's dependents argued below that it was unclear whether he drove his personal vehicle or the blue service truck to Walden, the Commission found that he drove the blue service truck. That finding is not disputed on appeal. By running a personal errand in a company vehicle, Hamilton violated Alpha's policies regarding the use of those vehicles. Hamilton called Tawni again at 2:44 p.m. and that call lasted fourteen minutes. Tawni testified that Hamilton told her he had to return to the job site and seemed frustrated regarding that fact.[3]

---

[1] Zaharie also testified that, because the white service truck was available and the blue service truck could be retrieved from Hamilton's home if necessary, there was no need to switch trucks.

[2] Cell reception was not available at the job site and became available only about two miles north or eight miles south on Highway 230.

[3] In written statements prior to the hearing and in many of her statements during the hearing, Tawni maintained that Hamilton told her he was going back to the job site, but did not claim that he offered additional detail as to why he was doing so or where, precisely, he was going. The last time she was asked at the hearing what Hamilton said regarding returning to the job site, Tawni testified that he stated he was going back "because they had fixed the breakdown [of the logging equipment] and that that's where he was going back to and he had to stop at the storage container first." Because Tawni had not previously testified that Hamilton made these more specific statements regarding his return to the job site, the referee elected to disregard them. The referee relied instead only on Tawni's consistent testimony that Hamilton stated he was returning to the job site.

3

Minutes after ending this conversation, Hamilton was involved in a fatal accident with a semi-trailer truck. According to a report from the Wyoming Highway Patrol, Hamilton backed the blue service truck out of the dirt road leading to the active logging site and travelled south on Highway 230.[4] The report states that as Hamilton attempted a left-hand turn onto the dirt road leading to Alpha's storage container he was broadsided by a southbound semi-truck that had moved into the left hand lane in an attempt to pass. Hamilton's vehicle was pushed off the road and the trailer of the semi-truck came to rest on the cab of the blue service truck.

Just prior to the accident, Leo drove the white service truck to the storage container to retrieve hydraulic fluid. He was in the storage container and heard the accident when it occurred. Leo recognized the blue service truck and asked a nearby resident to call 911. Hamilton was pronounced dead when police arrived on the scene a short time later.

Tawni filed a worker's compensation complaint in October of 2012. Alpha and Dallas National responded by denying benefits, arguing that the accident did not arise out of and in the course of Hamilton's employment. A referee held a hearing on July 17, 2013. On January 9, 2014, the referee proposed findings of fact and conclusions of law, and made a recommendation with respect to benefits. The referee determined that, more likely than not, the accident arose out of and in the course of Hamilton's employment. Given these factual findings, the referee recommended awarding Tawni and Hamilton's two children burial and income benefits. Though Hamilton's dependents requested attorney fees pursuant to Idaho Code section 72-804, the referee recommended denying that request. On the same day, the Commission adopted the referee's proposed findings of fact and conclusions of law, as well as its recommendation to award benefits and to decline to award attorney fees.

Alpha and Dallas National filed a motion for reconsideration arguing that there was no substantial and competent evidence to support the finding that the accident arose out of and in the course of Hamilton's employment. The Commission denied that motion. Alpha and Dallas National promptly appealed, making the same arguments they made below. They argue that, at best, the evidence suggests Hamilton was on his way to work, but had not yet arrived. Hamilton's dependents argue that the Commission erred in declining to award fees under Idaho Code section 72-804 and that this Court should award fees on appeal under the same statute.

---

[4] Though Hamilton was backing out of the dirt road leading to the active logging site just prior to the accident, there is no evidence that Hamilton had just been at the active logging site.

## II.
## ISSUES ON APPEAL

1. Whether there is substantial and competent evidence to support the Commission's finding that the accident arose out of and in the course of Hamilton's employment.

2. Whether the Commission erred in failing to award attorney fees to Hamilton's dependents under Idaho Code section 72-804.

3. Whether Hamilton's dependents are entitled to attorney fees on appeal under Idaho Code section 72-804.

## III.
## DISCUSSION

### A. Standard of Review

When this Court reviews a decision of the Industrial Commission, it exercises free review over questions of law, but reviews questions of fact only to determine whether substantial and competent evidence supports the Commission's findings. Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion. Because the Commission is the fact finder, its conclusions on the credibility and weight of the evidence will not be disturbed on appeal unless they are clearly erroneous. This Court does not weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented.

*Eacret v. Clearwater Forest Indus.*, 136 Idaho 733, 735, 40 P.3d 91, 93 (2002) (internal citations omitted). The Court "views all facts and inferences in the light most favorable to the party who prevailed before the Commission," *Dinius v. Loving Care & More, Inc.*, 133 Idaho 572, 574, 990 P.2d 738, 740 (1999), and "liberally construe[s] the provisions of the worker's compensation law in favor of the employee, in order to serve the humane purpose for which the law was promulgated." *Murray-Donahue v. Nat'l Car Rental Licensee Ass'n*, 127 Idaho 337, 340, 900 P.2d 1348, 1351 (1995).

### B. There is substantial and competent evidence supporting the Commission's finding that the accident arose out of and in the course of Hamilton's employment.

Appellants make the same arguments on appeal that they made below. First, they argue that there is no substantial and competent evidence that Hamilton was turning on to the dirt road leading to the storage container for a work-related purpose when the accident occurred. Second, they argue that, even if Hamilton was turning on to the dirt road for a work-related purpose, he was merely "coming to" work, had not yet arrived, and so benefits are not appropriate. With respect to both arguments, Appellants ask this Court to re-weigh evidence and re-evaluate the Commission's factual determinations.

5

"To receive benefits under Idaho's worker's compensation regime, a claimant must establish that he suffered an injury as defined by Idaho Code § 72-102." *Vawter v. United Parcel Serv., Inc.*, 155 Idaho 903, 907, 318 P.3d 893, 897 (2014). "Injury" is defined by that statute to mean "a personal injury caused by an accident arising out of and in the course of any employment covered by the worker's compensation law." I.C. § 72-102(18)(a). An "accident" is "an unexpected, undesigned, and unlooked for mishap, or untoward event, connected with the industry in which it occurs, and which can be reasonably located as to time when and place where it occurred, causing injury." I.C. § 72-102(18)(b). Where, as here, there was unquestionably an accident, "the test for determining compensability is two-pronged, and the claimant must satisfy both elements to be entitled to compensation." *Kessler on Behalf of Kessler v. Payette Cnty.*, 129 Idaho 855, 859, 934 P.2d 28, 32 (1997). The claimant has the burden to show by a preponderance of the evidence that the accident in which he was injured (1) arose out of and (2) in the course of his employment. *Cheung v. Wasatch Elec.*, 136 Idaho 895, 897, 42 P.3d 688, 690 (2002). "The words 'out of' have been held to refer to the origin and cause of the accident and the words 'in the course of' refer to the time, place, and the circumstances under which the accident occurred." *Dinius*, 133 Idaho at 574, 990 P.2d at 740. "An injury is deemed to be in the course of employment when it takes place while the worker is doing the duty which he is employed to perform." *Id.* at 575, 990 P.2d at 741. "The injury is considered to arise out of the employment when a causal connection is found to exist between the circumstances under which the work must be performed and the injury of which the claimant complains." *Id.* "The determination of whether an accident arose out of and in the course of employment is a factual determination." *Mortimer v. Riviera Apartments*, 122 Idaho 839, 845, 840 P.2d 383, 389 (1992). As a result, "the Court will defer to the Commission's finding if it is supported by substantial and competent evidence." *Id.* And, "[i]f there is doubt surrounding whether the accident in question arose out of and in the course of employment, the matter will be resolved in favor of the employee." *Spivey v. Novartis Seed Inc.*, 137 Idaho 29, 33, 43 P.3d 788, 792 (2002).

Appellants argue, first, that there is no substantial and competent evidence that Hamilton was turning on to the dirt road for a work-related purpose when the accident occurred. While the referee acknowledged that it was not clear precisely why Hamilton was returning to the job site, he determined and the Commission agreed that it was more likely than not that Hamilton was doing so to serve Alpha's interests and in furtherance of his job responsibilities. Hamilton's

6

dependents floated the theory below that Hamilton might have been driving to the active logging site when he saw Leo parked at the storage container and decided to discuss whether the blue service truck was needed. A private investigative report submitted as an exhibit by Appellants reports Leo as observing that "there are a lot of possibilities as to what Mr. Hamilton was doing when the accident occurred, as he could have been checking if it was time to switch trucks; however, he [Leo] does not know." Leo later claimed not to remember making this statement to the private investigator. But, he acknowledges that while there was no immediate need to switch trucks and no plan to do so at some specific time, he and Hamilton were going to "see how it was going to go" and determine whether and when it would be necessary to leave the blue service truck with Leo. Zaharie likewise testified in his deposition that, because it is important to have the service trucks at the job site, Hamilton may have been checking on the need to leave the blue service truck. Like Leo, Zarahie later claimed that there was no immediate need to do so, however. Zaharie also claimed not to know why Hamilton was driving to the storage container, but speculated that it may have been because Hamilton saw that Leo was there and was going to check on the status of the hydraulic cylinder. There was some dispute below as to whether Hamilton would have been able to see that Leo was parked at the storage container from the highway. Leo claimed that he parked near the storage container, with the container between his vehicle and the road. He suggested that, as a result, Hamilton may not have been able to see the white service truck parked from the highway. Later, however, Leo testified that "there is a good chance" that Hamilton could have seen the white service truck from the highway near the dirt road leading to the active logging site.

The referee did not purport to resolve these disputes concerning Hamilton's reason for turning down the dirt road, though he did note the theory that Hamilton was checking to see if it was necessary to trade trucks was "reasonable, and perhaps even plausible." According to the referee, it was not necessary to resolve these disputes because, whatever the precise reason Hamilton was turning down the road leading to the storage container, he was likely doing so in furtherance of his work. There is substantial and competent evidence to support that conclusion. Both Zaharie and Leo speculated that Hamilton was turning down the dirt road for a reason associated with work. The evidence established that Alpha employees regularly drove to the storage container for work, and no evidence suggested any personal reason why Hamilton might have turned towards the storage container. More importantly, Tawni testified that Hamilton told

7

her he had to go back to the work site only minutes before he was killed in the accident and that he seemed frustrated regarding that fact. Given Hamilton's statement that he "had to" return to the work site, his apparent frustration regarding that fact, and the fact that he was not feeling well at the time, it is reasonable to believe that Hamilton was driving to the storage container to perform some work-related function and not for some personal reason.[5]

Appellants point to evidence that Hamilton was not turning down the dirt road for a work-related purpose. They note, for instance, that Hamilton had already filled out his time sheet and was returning from a personal errand, suggesting that he was finished with work for the day. But, Zaharie testified that Hamilton and other employees occasionally stopped working for a period, particularly when a piece of equipment was malfunctioning, and later resumed work. He acknowledged that Hamilton, in particular, sometimes revised his time sheet to reflect additional time worked. Even if Hamilton could not have gone back on the clock, this Court has held that a claimant need not be on the clock at the time an accident occurs for the accident to occur in the course of employment. *See, e.g., Nichols v. Godfrey*, 90 Idaho 345, 349, 411 P.2d 763, 765 (1966) (holding that the accident occurred in the course of employment where an employee walking from the building in which she worked to the employer's parking lot to leave for the day was struck by a vehicle). Appellants also note that all of the logging equipment was being used when the accident occurred and, as a result, Hamilton could not have resumed his shift on that equipment. There is no dispute, though, that Hamilton was employed not only to operate logging equipment, but to maintain that equipment. As Zaharie speculated, Hamilton may have been returning to ensure that the broken equipment had been repaired. Whether Hamilton was checking on the malfunctioning equipment or checking to determine whether it was necessary to switch vehicles with Leo, the Commission could reasonably conclude from the evidence before it that Hamilton was acting to "further the work and interests" of Alpha. *In re MacKenzie*, 55 Idaho 663, 670, 46 P.2d 73, 76 (1935) (holding that an employee who was killed while checking on malfunctioning equipment, though it was not his job to run or maintain the equipment, was acting in the course of his employment because he was serving his employer's interests). The Commission considered all of the evidence to which Appellants point on appeal. When

---

[5] Appellants also passingly suggest that Hamilton might not have been turning at all, but might have merely drifted into the left-hand lane when the accident occurred. That suggestion is contrary to the accident report issued by the Wyoming Highway Patrol, which states that Hamilton was making a left-hand turn when the accident occurred. There is no evidence to contravene that report. That suggestion also flies in the face of Tawni's testimony that Hamilton said that he was headed back to work.

considering a decision by the Commission, this Court "does not reweigh evidence or consider whether it would have reached a different conclusion based upon the evidence presented." *Ginther v. Boise Cascade Corp.*, 150 Idaho 143, 147, 244 P.3d 1229, 1233 (2010).

Second, Appellants argue that, even if Hamilton was turning on to the dirt road towards the storage container to serve Alpha's interests, Hamilton was merely "coming to" work, but had not yet arrived, and so benefits are not appropriate. This Court has adopted the so-called "coming and going rule," which provides that "compensation is not allowed to workers for injuries occurring on the way to or from work, based on the perception that such injuries are not sufficiently causally linked to employment." *Pitkin v. W. Const.*, 112 Idaho 506, 507, 733 P.2d 727, 728 (1987). As with most rules, this one is subject to a variety of exceptions. *See id.* (outlining a series of exceptions). Appellants fixate on one, in particular, and argue that the exception is inapplicable here, despite the fact that neither the Commission nor Hamilton's dependents relies upon it. The "travelling employee" exception to the coming and going rule provides that "[w]hen an employee's work requires him to travel away from the employer's place of business or his normal place of work, the employee is covered by worker's compensation." *Cheung*, 136 Idaho at 897, 42 P.3d at 690. Appellants argued below, and argue again on appeal, that the travelling employee exception to the coming and going rule does not apply in this case because Hamilton was hired solely to work in Wyoming, was not paid for housing in Wyoming or for travel to Wyoming, and was not authorized to use company vehicles to run personal errands in the manner that he did just prior to the accident.

The Commission found that the coming and going rule is inapplicable in this case because, for purposes of that rule, Hamilton was at Alpha's place of business—and not merely coming to it—when the accident occurred. It is undisputed that Alpha's employees, including Hamilton, regularly travelled the short distance between the active logging site and the storage container to retrieve supplies and equipment, taking precisely the route travelled by Hamilton when the accident occurred. In fact, Leo was in the storage container in furtherance of his job duties when the accident occurred. According to Zaharie, the Wyoming work site consisted of "the container, the jobsite, where they're parked, all that general area." The referee endorsed that view, finding that Alpha's place of business "included, at a minimum, the active logging area, the shop container, and the route(s) one would take between the two." Because Hamilton was travelling between the dirt road leading to the active logging site and the dirt road leading to the

9

storage container, the referee determined that, for purposes of the coming and going rule, Hamilton was not merely coming to work when the accident occurred, but was driving within Alpha's place of business.

Whether Hamilton was at Alpha's place of business and his normal place of work when the accident occurred is a factual question for the Commission. The Commission's conclusion that he was is supported by substantial and competent evidence. This Court has stated that the coming and going rule is justified by "the perception that . . . injuries [that occur on the way to or from work] are not sufficiently causally linked to employment." *Pitkin*, 112 Idaho at 507, 733 P.2d at 728. The exceptions to the rule, meanwhile, "arise when there appears a causal connection" between the injury and the employment. *Id.* Here, the referee determined that:

> [t]here is a clear connection between the conditions existing on the premises and the accident. [Alpha] required the workers to cross a public highway to go to and from the storage shed to the active work site, which they had to do on a regular basis. Claimant was killed crossing this highway.

The fact that the accident occurred in a place he was regularly asked to work and as a result of conditions he regularly encountered during his work suggests that the coming and going rule is inapplicable, whether because Hamilton was already at his place of employment or because some exception to the rule should govern the case. The Commission did not err in determining that, for purposes of the coming and going rule, Hamilton was at Alpha's place of business when the accident occurred and the coming and going rule is inapplicable.

The referee relied on Idaho Code section 72-228 to generate a presumption that the accident arose out of Hamilton's employment. That statute provides that:

> In any claim for compensation, where the employee has been killed, or is physically or mentally unable to testify, and where there is unrebutted prima facie evidence that indicates that the injury arose in the course of employment, it shall be presumed, in the absence of substantial evidence to the contrary, that the injury arose out of the employment and that sufficient notice of the accident causing the injury has been given.

I.C. § 72-228(1). Even without the presumption in that statute, however, the Commission's factual findings independently establish that the accident arose out of Hamilton's employment.[6]

---

[6] The Commission also relied upon the rule that "[w]hen an injury occurs on an employer's premises, a presumption arises that the injury arose out of and in the course of employment." *Stevens-McAtee v. Potlatch Corp.*, 145 Idaho 325, 333, 179 P.3d 288, 296 (2008). For the same reason that the presumption in Idaho Code section 72-228 is largely irrelevant here, this presumption is largely irrelevant as well.

The Commission found that, because of the location of the storage container, Hamilton and other Alpha employees were required as part of their duties to regularly travel the distance between the storage container and the active logging site, making left hand turns off of Highway 230, and exposing themselves to the attendant risk of harm associated with that highway. Because Hamilton was killed while making such a left hand turn, "there is a clear connection between the conditions existing on the premises and the accident."

Appellants rely heavily on this Court's decision in *Dinius v. Loving Care and More, Inc.*, 133 Idaho 572, 990 P.2d 738 (1999), for the proposition that the accident did not arise out of Hamilton's employment. Dinius was injured in the parking lot of her employer's business when she was struck by a vehicle occupied by her friend when the friend accidentally put the vehicle in gear. *Dinius*, 133 Idaho at 573, 990 P.2d at 739. The Commission denied benefits because the friend was in the running vehicle solely for Dinius' benefit and convenience. *Id.* at 576, 990 P.2d at 742. As a result, the Commission concluded, the accident "was a result of a factor personal to Dinius" and was not causally related to the employment. *Id.* This Court affirmed, noting the deferential standard of review afforded to the Commission's factual findings. *Id.* The Court held that, given the Commission's view of the facts, "Dinius failed to show that she was injured because of exposure to a risk incident to her employment." *Id.*

This case differs importantly from *Dinius*. Unlike in *Dinius*, the accident was not caused by an instrumentality somehow personal to Hamilton. The instrumentality was not "imported by the employee from outside the sphere of employment." *Mayo v. Safeway Stores, Inc.*, 93 Idaho 161, 163, 457 P.2d 400, 402 (1969). Here, the Commission found as a matter of fact that the accident occurred as a result of a risk incident to Hamilton's employment. Given the nature of the employment, Hamilton and other Alpha employees were inevitably exposed to the risk associated with the highway. Hamilton was killed as a result of that risk.

Viewing all facts and inferences in the light most favorable to Hamilton's dependents and resolving any doubt as to whether the accident arose out of and in the course of Hamilton's employment in favor of them, there is substantial and competent evidence to support the Commission's factual finding that the accident arose out of and in the course of Hamilton's employment. The Commission did not err in awarding benefits to them.

**C. The question whether the Commission erred in failing to award attorney fees to Hamilton's dependents is not properly before the Court.**

11

Hamilton's dependents argue that the Commission erred in refusing to grant attorney fees under Idaho Code Section 72-804. They argue that because Appellants had all of the relevant facts and law available to them before contesting the benefits, they did not have any reasonable grounds to do so. The referee recommended not awarding fees in this case because "[t]he outcome . . . was not necessarily self-evident, and Defendants' position was not without merit." The Commission endorsed that recommendation.

Idaho Code section 72-804 provides that:

> If the commission or any court before whom any proceedings are brought under this law determines that the employer or his surety contested a claim for compensation made by an injured employee or dependent of a deceased employee without reasonable ground . . . the employer shall pay reasonable attorney fees in addition to the compensation provided by this law.

"Whether or not grounds exist for awarding a claimant attorney fees under Idaho Code § 72-804 is a factual determination that rests with the Commission. The Commission's decision regarding the awarding of attorney fees will be upheld if it is based upon substantial, competent evidence." *Davidson v. Riverland Excavating, Inc.*, 147 Idaho 339, 346, 209 P.3d 636, 643 (2009). While the merits of the Commission's decision are debatable, our appellate rules preclude us from addressing those merits.

Idaho Appellate Rule 15(a) provides that:

> After an appeal has been filed, a timely cross-appeal may be filed from any interlocutory or final judgment or order. If no affirmative relief is sought by way of reversal, vacation or modification of the judgment or order, an issue may be presented by the respondent as an additional issue on appeal under Rule 35(b)(4) without filing a cross-appeal.

"In Idaho, a timely notice of appeal or cross-appeal is a jurisdictional prerequisite to challenge a determination made by a lower court. Failure to timely file such a notice shall cause automatic dismissal of the issue on appeal." *Miller v. Bd. of Trustees*, 132 Idaho 244, 248, 970 P.2d 512, 516 (1998) (internal quotation marks omitted). Though Hamilton's dependents seek to modify the decision below, they failed to file a necessary cross-appeal. As a result, the question is not properly before the Court. *See id.* (holding that the question whether a district court properly denied an award of certain fees was not properly before the Court where the respondent failed to file a cross-appeal).

**D. Hamilton's dependents are entitled to fees on appeal.**

Hamilton's dependents request attorney fees on appeal pursuant to Idaho Code section 72-804. "[A]ttorney fees and costs are properly awarded when an appeal asks this Court to do

nothing more than reweigh the evidence submitted to the Commission." *Wutherich v. Terteling Co.*, 135 Idaho 593, 596, 21 P.3d 915, 918 (2001). Appellants have advanced the same arguments on appeal as they did below and have simply asked this Court to reweigh evidence already presented to the Commission. Therefore, attorney fees and costs on appeal are appropriate.

## IV.
## CONCLUSION

We affirm the Industrial Commission's decision awarding benefits to Hamilton's dependents and denying an award of attorney fees below. We award costs and attorney fees on appeal to Hamilton's dependents.


Chief Justice BURDICK, and Justices EISMANN, W. JONES, and HORTON CONCUR.