# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49570

JASON S. ELDRIDGE,

   Claimant-Respondent,

v.

AGAR LIVESTOCK, LLC, Employer,

   Defendant-Appellant,

and

MEISSEN TRUCKING, Uninsured Employer; SNAKE RIVER CATTLE FEEDERS, LLC, Employer; OUTWEST LIVESTOCK, LLC, Employer; and LIBERTY NORTHWEST INSURANCE CORP., Surety,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, August 2022 Term

Opinion Filed: September 19, 2022

Melanie Gagnepain, Clerk

Appeal from the Idaho Industrial Commission.

The Idaho Industrial Commission's order is <u>affirmed</u>.

Givens Pursley, LLP, Boise, for Appellant. Amber N. Dina argued.

McConnell Wagner Sykes & Stacy, PLLC, Boise, for Respondent. Joseph Wager argued.

_____

BRODY, Justice.

This expedited appeal arises out of an Idaho Industrial Commission ("Commission") order deeming Agar Livestock, LLC ("Agar"), a category one statutory employer of Jason Eldridge under Idaho's Worker's Compensation Act. Agar appeals the order, arguing it is not a category one statutory employer because it is "merely a broker that locates livestock trucks available to transport livestock for shippers." According to Agar, it did not contract for services

from Eldridge's employer, Meissen Trucking ("Meissen"). In its decision, the Commission disagreed and found that, based on the parties' contractual relationship, Agar had contracted for services from Meissen. For the reasons discussed below, the Commission's decision is supported by substantial and competent evidence. Thus, we affirm.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background.

Roy M. "Matt" Agar formed Agar as an Oregon limited liability company in 2003. Prior to forming Agar, Matt Agar operated a livestock hauling business—"Roy M. Agar Livestock Transportation"—which at one time owned trucks, employed drivers, and carried workers compensation insurance across multiple states. However, at the time of the underlying events, Roy M. Agar Livestock Transportation was no longer in operation.

According to Matt Agar, unlike his previous company, "Agar operated as a livestock load brokerage service and not as a livestock hauling business." Agar would receive calls from clients needing loads to be transported, and Agar would also receive calls from owner-operators of trucks (i.e., carriers) looking for loads to haul. Agar would "dispatch" loads to carriers and then bill the company requesting the load. Once the load was delivered by the carrier and Agar received payment, Agar would deduct its "brokerage fee" and remit the remaining funds to the carrier. Agar has never employed any drivers or owned any of its own trucks. However, Agar leased approximately nine livestock trailers to the carriers to which it dispatched loads.

On July 17, 2014, Agar and Meissen entered into a "Brokerage Agreement" and "Trailer Lease Agreement" with overlapping terms regarding hauls and compensation. The Brokerage Agreement provides that Meissen "desires to retain [Agar] to procure contracts for the transportation of livestock to be transported by [Meissen]." It states that Meissen is an "independent contractor, and not an employee of [Agar]." It also includes, among other things, obligations that Agar has to Meissen—and that Meissen has to Agar. For example, Meissen must provide the bill of lading to the receiver and to Agar, but Meissen "shall not accept any payments tendered to [Meissen] from [the] shipper or receiver." The Brokerage Agreement repeatedly refers to Meissen as "transporting livestock for Agar."

The Trailer Lease Agreement provides that Meissen is leasing a trailer from Agar, and that the "[r]ent" paid by Meissen to Agar is "10% of the gross revenue for each haul made by [Meissen]." The Trailer Lease Agreement, like the Brokerage Agreement, tied compensation to

the successful delivery of loads dispatched by Agar to Meissen. In addition to these agreements, Agar provided Meissen (and other carriers who leased trailers from Agar) with a fuel card as an advance to ensure delivery of the loads Agar dispatched. Later, when Meissen hired Eldridge, Meissen entrusted Eldridge with Agar's fuel card.

Moving forward to the underlying events, there was an initial dispute over the source of the ordered shipment, but the Commission ultimately found that "at some point prior to January 18, 2018, an employee of AB Genetics contacted [OutWest Dispatch] to arrange for the transport of the cattle in question." Notably, AB Genetics and OutWest Dispatch are not parties to this case. OutWest Dispatch typically dispatches "all, or almost all, of its brokered loads to OutWest Livestock for hauling." However, in this instance, OutWest Livestock did not have enough trucks to transport all of AB Genetics' cattle. Because of this, OutWest Dispatch "passed on some of the dispatches to Agar in order for Agar to find someone to haul the cattle in question." The cattle were to be transported from a feedlot in American Falls, Idaho, owned and operated by Snake River Cattle Feeders, LLC ("Snake River"), to a processing facility in Toppenish, Washington. It was initially disputed by Eldridge, but the Commission ultimately found that Snake River was not involved in contracting for the shipment of AB Genetics' cattle.

Once Agar received the dispatch from OutWest Dispatch, "Agar, in turn, dispatched four trucks owned by owner-operators to" the Snake River feedlot "including the Meissen truck (with the trailer that Meissen leased from Agar) driven by [Eldridge]." On the morning of January 18, 2018, while at Snake River's feedlot, Eldridge was severely injured when he attempted to load cattle from Snake River's chute into Agar's trailer. In essence, a cow charged Eldridge, struck him between the shoulder blades, shoved him into a gate, trampled him, and rendered him unconscious. According to Eldridge, the gate on the chute was not "spring-loaded" and instead used a "sucker rod" that made it difficult to open and close. When Eldridge tried to get away from the cow as it charged out of the trailer, the chute gate would not open, and Eldridge was trapped. Eldridge was taken to the emergency room and later admitted for numerous broken bones and a pulmonary contusion (i.e., a bruised lung).

After the accident, Agar billed OutWest Dispatch for three completed loads. "[T]he fourth load, Meissen's, was not completed due to Eldridge's injuries, and thus Agar did not bill [OutWest Dispatch] for that load." On January 23, 2018, Snake River, acting on behalf AB Genetics, issued payment to OutWest Dispatch for the carrier services on the date of the

accident. OutWest Dispatch then subtracted its dispatch fees from the payment and sent the remainder to Agar as payment for the three completed loads (and other loads not relevant here). "Upon receipt of payment from [OutWest Dispatch], Agar disbursed payment to the owner-operators that delivered their loads, minus Agar's agreed upon brokerage fees and/or fees for leasing its trailer." Had Eldridge delivered his load, Meissen would have been paid by Agar in the same manner.

## B. Procedural Background.

Roughly two weeks after his accident, Eldridge filed a worker's compensation complaint against Meissen. Eventually, Eldridge obtained counsel, and amended his complaint to add Agar, OutWest Livestock (a separate entity from OutWest Dispatch), and Snake River, along with their respective sureties. In response, Agar's surety, Travelers Property Casualty Company ("Travelers"), answered for Travelers "only" and stated that Agar was "not insured for worker's compensation liability under the Idaho Worker's Compensation Act[.]" (Emphasis original.) Three months later, the Commission dismissed Travelers from the case. One month after that, the Commission bifurcated the case and ordered that the only issues before it were: (1) whether Eldridge was an employee of Meissen or an independent contractor; and (2) whether Agar, OutWest Livestock, and/or Snake River were statutory employers of Eldridge.

Earlier in the case, Meissen was represented by an attorney who had argued Eldridge was an "independent contractor" and not an "employee" of Meissen. However, after pre-hearing depositions, Meissen's counsel moved to withdraw, citing "ethical reasons." The Commission granted the motion, and despite being given 150 days to do so, Meissen failed to retain additional counsel. As business entities are required to appear through counsel before the Commission, the Commission eventually entered default against Meissen. Nonetheless, it was never disputed that "[a]t the time of the accident, Meissen did not carry worker's compensation insurance."

One month after bifurcating the case, the Commission held a hearing to address the two issues before it. At the hearing, numerous persons testified, and Eldridge maintained that he was an employee of Meissen, and that Agar, OutWest Livestock, and/or Snake River were his statutory employers. A post-hearing deposition was also taken to address the dispute over OutWest Dispatch's versus OutWest Livestock's role in the underlying dispatch to Agar. Roughly nine months after the hearing, the Commission issued its written decision. The Commission concluded that under the "right to control" test, Eldridge was an employee of

Meissen. Because Meissen failed to carry worker's compensation insurance, the Commission turned to whether Agar, OutWest Livestock, and/or Snake River were category one statutory employers of Eldridge under Idaho Code section 72-102(12)(a).

Regarding Agar, the Commission found that "successful delivery of cattle" was a "major part of the service" that Agar agreed to provide shippers (e.g., AB Genetics), "albeit by contracting with Meissen." Based on the Brokerage Agreement, the Trailer Lease Agreement, and the operational reality of Agar's right to compensation depending on Meissen's success in delivering loads dispatched by Agar, the Commission found that Agar had contracted for services from an entity under it (Meissen) who was Eldridge's direct employer. From this, the Commission found Agar a category one statutory employer of Eldridge. In addition, because neither party had worker's compensation insurance, the Commission found both Meissen and Agar liable to Eldridge for compensation plus penalties under Idaho Code section 72-210.

Moving up the contractual chain alleged by Eldridge, the Commission then examined whether OutWest Livestock and/or Snake River were statutory employers of Eldridge. Regarding OutWest Livestock, the Commission found no evidence to support Eldridge's contention that OutWest Livestock was an upstream entity responsible for ordering or contracting the shipment of AB Genetics' cattle. Instead, it was OutWest Dispatch—a separate entity from OutWest Livestock—that had taken and relayed AB Genetics' shipment request to Agar. From this, the Commission concluded that OutWest Livestock was not a category one statutory employer within the contractual chain of liability under Idaho Code section 72-216.

Regarding Snake River, the Commission noted that Eldridge had conceded Snake River was not a category two statutory employer. Thus, the Commission only examined whether Snake River was a category one statutory employer of Eldridge. In doing so, the Commission found that Snake River had not contracted for, and was not involved in, the transport of AB Genetics' cattle. Instead, Snake River had merely, on behalf of AB Genetics, issued an advance payment to OutWest Dispatch for the transportation services on the day of the incident, and then billed AB Genetics for the same. From this, the Commission concluded that Snake River was not a category one statutory employer of Eldridge.

Afterwards, Agar moved for the Commission to determine that its decision deeming Agar a category one statutory employer was immediately appealable to this Court under Idaho

Appellate Rules 11(d)(2) and 12.4. The Commission granted Agar's motion, and Agar timely filed a notice of appeal.

## II.    STANDARD OF REVIEW

"When this Court reviews a decision of the Industrial Commission, it exercises free review over questions of law, but reviews questions of fact only to determine whether substantial and competent evidence supports the Commission's findings." *Hamilton v. Alpha Servs., LLC*, 158 Idaho 683, 688, 351 P.3d 611, 616 (2015). "Substantial and competent evidence is 'relevant evidence which a reasonable mind might accept to support a conclusion.' " *Neihart v. Universal Joint Auto Parts, Inc.*, 141 Idaho 801, 803, 118 P.3d 133, 135 (2005) (quoting *Boise Orthopedic Clinic v. Idaho State Ins. Fund,* 128 Idaho 161, 164, 911 P.2d 754, 757 (1996)). "This Court does not weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented." *Hamilton*, 158 Idaho at 688, 351 P.3d at 616.

## III.    ANALYSIS

Agar argues the Commission erred in deeming it a category one statutory employer of Eldridge under the Worker's Compensation Act (Idaho Code §§ 72-101 to -1717). Agar's central argument is that it is a "transportation broker" and as such, it does not fall within the definition of an "employer" under Idaho Code section 72-102(12)(a) which is necessary to be found a category one statutory employer of Eldridge. For the reasons discussed below, we conclude Agar's appeal misses the mark.

"Under the Idaho worker's compensation laws, an 'employer' is more broadly defined than under the common law." *Gonzalez v. Lamb Weston, Inc.*, 142 Idaho 120, 122, 124 P.3d 996, 998 (2005). As such, an "employee may have more than one employer: the employer who directly hired the employee and a person or entity who, by statute, is also held to be the employer for the purposes of worker's compensation." *Richardson v. Z & H Constr., LLC*, 167 Idaho 345, 350–51, 470 P.3d 1154, 1159–60 (2020) (quoting *Lamb Weston, Inc.*, 142 Idaho at 122, 124 P.3d at 998). In other words, in worker's compensation law, a party may be deemed an "employer" by statute. Statutory employers can be held liable for worker's compensation benefits under Idaho Code section 72-216, but in exchange, they also enjoy immunity from liability for common law torts. *Richardson*, 167 Idaho at 351, 470 P.3d at 1160. This is known as the "exclusive remedy rule" for injured workers. *See* I.C. § 72-209; *Gomez v. Crookham Co.*, 166 Idaho 249, 256, 457 P.3d 901, 908 (2020).

To determine if a party is a statutory employer, the starting point is the definition of "employer" under Idaho Code section 72-102(12)(a):

> *"Employer" means any person who has expressly or impliedly hired or contracted the services of another.* It includes contractors and subcontractors. It includes the owner or lessee of premises, or other person who is virtually the proprietor or operator of the business there carried on, but who, by reason of there being an independent contractor or for any other reason, is not the direct employer of the workers there employed. It also includes, for purposes of section 72-438(12) and (14), Idaho Code, a municipality, village, county or fire district that utilizes the services of volunteer firefighters. If the employer is secured, it means his surety so far as applicable.

I.C. § 72-102(12)(a) (emphasis added).

A statutory employer is liable for compensation to an injured employee of an employer "under" it if that employer has failed to obtain worker's compensation insurance as required by Idaho Code section 72-301. I.C. § 72-216(1). To illustrate, if an employer (here, Meissen) has not complied with section 71-301 by failing to provide worker's compensation coverage, the person who contracted for the employer's services (here, Agar) is statutorily liable to provide worker's compensation benefits to the injured employee (here, Eldridge).

In reading the definition of "employer" in section 72-102(12)(a) alongside its use in section 72-216 (statutory employer liability) and section 72-223 (third party liability), we have separated statutory employers into two categories. *Fuhriman v. State, Dep't of Transp.*, 143 Idaho 800, 804–05, 153 P.3d 480, 484–85 (2007). The only issue in this case is whether Agar is a category one statutory employer of Eldridge. A category one statutory employer is "any person who has expressly or impliedly hired or contracted the services of another." *Id.* (quoting I.C. § 72-102(13)(a) now codified at § 72-102(12)(a) (2021 Idaho Sess. Laws, ch. 82, § 1)). As reflected by the second sentence in section 72-102(12)(a), category one statutory employers include, but are not limited to, "contractors and subcontractors." *Fuhriman*, 143 Idaho at 804–805, 153 P.3d at 484–85.

Indeed, a party may be deemed a category one statutory employer "simply because of its contractual relationship" with the employer of the injured employee. *Venters v. Sorrento Delaware, Inc.*, 141 Idaho 245, 251, 108 P.3d 392, 398 (2005) (holding Sorrento was a category one statutory employer because it had contracted with the claimant's employer for wastewater removal services); *see also Kolar v. Cassia Cnty.*, 142 Idaho 346, 352, 127 P.3d

962, 968 (2005) (holding Burley Highway District was a category one statutory employer because it had "contracted the services of" the claimant's employer for a construction project).

Here, consistent with *Venters* and *Kolar*, the Commission applied the definition of "employer" in section 72-102(12)(a) to examine whether Agar had contracted for services from Meissen. Ultimately, the Commission found that, although Meissen had contracted for services from Agar—Agar had also contracted for services from Meissen. Thus, the Commission found Agar to be a category one statutory employer of Eldridge (an employee of Meissen). The Commission reached this conclusion based on the Brokerage Agreement, the Trailer Lease Agreement, and the operational relationship between Agar and Meissen. Our review of the record shows that the Commission's decision is based upon substantial and competent evidence.

First, the Brokerage Agreement contains numerous provisions supporting the finding that Agar contracted for carrier services from Meissen to fulfill shipment contracts for Agar's clients. For example, even though the Brokerage Agreement provides that Meissen is an "independent contractor"; it places mutual obligations on both Agar and Meissen from dispatch *through to delivery*; ties Agar's compensation to Meissen's successful delivery of loads dispatched by Agar; grants Agar the right, upon termination, to "enter any premises" to retrieve livestock still in Meissen's possession; and repeatedly refers to Meissen as "transporting livestock *for [Agar]*." (Emphasis added.) The Brokerage Agreement also precludes Meissen from accepting payments directly from shippers or receivers. Agar did not allow Meissen to contract and deal with the shipper or receiver once Agar "brokered" or dispatched a load. Instead, Agar handled all payments and would only pay Meissen (hauling Agar's trailer) once Meissen successfully delivered the load dispatched by Agar.

Second, the structure and relation of the Trailer Lease Agreement to the Brokerage Agreement supports the same finding. Under the terms of the Trailer Lease Agreement, Meissen did not simply lease a trailer from Agar for a set rent unconnected to Meissen's role in "transporting livestock for [Agar]." Instead, Agar only received rent for the trailer if Meissen successfully delivered a livestock load dispatched by Agar. Moreover, outside these agreements, Agar provided Meissen with a fuel card as an advance to ensure the successful delivery of livestock for Agar's clients. Viewed as a whole, this evidence supports the finding that Agar contracted for Meissen to provide reliable carrier services to Agar so that Agar could in turn service its shipper clients—without Agar needing to *employ* Meissen. Despite its contentions on

appeal, Agar is much more than a typical brokerage or mere "match-maker" in its contractual relationship to Meissen.

Finally, we note that Agar's reliance on *Transplace Stuttgart, Inc. v. Carter*, 255 S.W.3d 878 (Ark. Ct. App. 2007), to exempt itself from the definition of "employer" under section 72-102(12)(a) is misguided. In *Transplace*, the Arkansas Court of Appeals held that a transportation broker, similar to Agar, was not a statutory employer of an injured worker because the transportation broker did not meet the definition of a "prime contractor" (i.e., general contractor) under Arkansas Code section 11-9-402(a). 255 S.W.3d at 881. To meet that definition, the transportation broker must have "subcontracted" or "farm[ed] out" work to the injured worker's employer that the transportation broker was itself obligated to perform. *Id*. at 880–81. However, this type of reasoning is inapposite to Agar's appeal. Unlike the law in Arkansas, in Idaho, a person does not need to be acting as a "contractor" or "subcontractor" in the "classic sense" of the word to be a category one statutory employer. *Fuhriman*, 143 Idaho at 805, 153 P.3d at 485. Instead, a person may be deemed one simply by "expressly or impliedly hir[ing] or contract[ing] the services of another." I.C. § 72-102(12)(a); *see Venters*, 141 Idaho at 251, 108 P.3d at 398; *Kolar*, 142 Idaho at 352, 127 P.3d at 968.

In sum, there is substantial and competent evidence to support the Commission's finding that Agar contracted for services from Meissen. Thus, the Commission's conclusion that Agar is a category one statutory employer of Eldridge is affirmed.

## IV.    CONCLUSION

For the reasons stated above, the order of the Commission is affirmed, and we award Eldridge costs on appeal under Idaho Appellate Rule 40(a).


Chief Justice BEVAN, and Justices STEGNER, MOELLER, and ZAHN CONCUR.