# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 48100

STEVE R. TENNY,  )
)
   Claimant-Respondent,  )
)  **Boise, May 2021 Term**
v.  )
)  **Opinion Filed: June 22, 2021**
LOOMIS ARMORED US, LLC, Employer;  )
and ACE AMERICAN INSURANCE CO.,  )  **Melanie Gagnepain, Clerk**
Surety,  )
)
   Defendants-Appellants.  )

Appeal from the Industrial Commission of the State of Idaho.

The decision of the Industrial Commission is <u>affirmed</u>.

Hawley Troxell, Boise, for appellant, Loomis Armored US, LLC. Mindy M. Muller argued.

Monroe Law Office, Boise, for respondent, Steve R. Tenny. Darin G. Monroe argued.

_____

STEGNER, Justice.

This is an appeal from a decision of the Idaho Industrial Commission. In December 2014, Steve Tenny (Tenny) sustained a right-sided lumbar disc herniation injury during the course of his employment with Loomis Armored US (Loomis). He immediately began treatment, receiving a series of right-sided steroid injections in his back at L3-4. At some point shortly after the second injection, Tenny began to complain of increasing left hip and groin pain and underwent testing and treatment for these symptoms. However, the worker's compensation insurance surety, Ace American Insurance Co., ultimately denied payment for treatment related to the left-side groin pain. Following the matter going to hearing, the Referee recommended that the Industrial Commission find that the left-sided symptoms were causally related to Tenny's December 2014 industrial accident. The Industrial Commission adopted the Referee's findings, and after unsuccessfully moving for reconsideration, the employer and surety (which will be jointly referred to as the Defendants) appealed to this Court. At issue is the question of causation: Was the left-

1

side groin pain experienced by Tenny causally related to his industrial accident? For the reasons set out below, we affirm the decision of the Industrial Commission.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

Tenny worked for Loomis as a driver, also known as an "armored service technician" (AST). On December 2, 2014, Tenny was pushing a pallet loaded with ore when he felt "a sharp shock" in his lower back. Within a few hours his pain and discomfort increased, and he presented at an urgent care facility with symptoms of radiating pain down his right leg to his toes. Tenny was referred for an MRI of his lumbar spine, which revealed that he had a right asymmetric disc extrusion at L3-4, with moderate to severe stenosis. In other words, Tenny had a disc herniation on the right side with moderate to severe narrowing of the spinal canal.

On December 22, 2014, Tenny received a right-sided epidural steroid injection (ESI) at L3-4. On January 8, 2015, Tenny received a second ESI in the same location. However, after the second injection, Tenny began to experience pain and discomfort in his left hip and groin. According to Tenny and his wife, this pain began immediately during the injection, while the handwritten notations on a diagnostic "block sheet" indicate that his left hip pain "[b]ecame very uncomfortable a few hours" after the injection. Tenny later testified that he told the individual performing the injection that he felt "pain in the deep part of" his left groin, but that he was told "it was impossible" because they were not injecting that area. When Tenny's wife testified, she corroborated Tenny's testimony that he had told her about the left-sided pain immediately after the injection, although she was not present during the injection.

Tenny's pain levels in his left groin increased in intensity over the next few days, and several weeks after the second injection he was referred to a neurological surgeon, Dr. Michael Hajjar. Dr. Hajjar ordered a new lumbar MRI, which was consistent with the prior scans. Dr. Hajjar then sent Tenny for a bilateral lower extremity nerve conduction study, which found normal results without any obvious neurological or neuropathic issues. Seeking to rule out this pain's relation to Tenny's previous left hip replacement which he underwent in January 2014, Dr. Hajjar advised Tenny to visit his prior surgeon, Dr. Roman Schwartsman. Tenny was referred by Dr. Schwartsman for x-rays of the hip and pelvis. Upon review of those images, Dr. Schwartsman concluded that the left hip replacement was not the cause of Tenny's pain.

2

Dr. Hajjar recommended back surgery, which Tenny underwent on April 6, 2015. Although Tenny's disc herniation was on the right side, Dr. Hajjar performed a bilateral surgery at L3-4, which included a microdiscectomy and decompression. As Tenny recovered from the surgery, he found that his right-sided back pain had resolved; however, the left hip and groin pain had not. Tenny underwent a CT scan of the pelvis, showing no pathological findings in the left-sided musculature.

Dr. Hajjar concluded that the back symptoms had resolved; however, because of the lingering left-sided groin and hip pain, he suggested pain management, and referred Tenny to Dr. Christian Gussner, a physician focused on physical medicine and pain medicine.

Dr. Gussner identified several possible sources for the incessant left-sided hip and groin pain, including an inguinal hernia, bursitis of the hip, or something related to Tenny's recent surgery. Dr. Gussner referred Tenny to a specialist for evaluation of a possible hernia.

On September 2, 2015, Dr. Gussner gave Tenny two steroid injections into the bursae of his left hip, but Tenny reported no relief in either injected area. By this time, Tenny had been evaluated by a specialist for a possible hernia, but no hernia was found. Suspecting that the pain was related to the prior left hip replacement or to opioid-induced hyperalgesia,[1] Dr. Gussner referred Tenny back to Dr. Schwartsman and advised Tenny to taper off opioid medication.

Tenny again visited Dr. Schwartsman. Dr. Schwartsman ordered a repeat MRI of the lumbar area to look for L3-4 pathology that would explain his symptoms. He also referred Tenny to a neurosurgeon, Dr. R. Tyler Frizzell.

On October 6, 2015, Tenny visited Dr. Frizzell for the first time. Dr. Frizzell ordered an intrathecal lumbar CT, but its results did not reveal anything that would account for Tenny's symptoms. Dr. Frizzell noted that Tenny's pain "may be related to some of the peripheral nerves innervating" the left groin. At this point, Dr. Frizzell referred Tenny to Dr. Sandra Thompson for further evaluation and pain management.

Tenny visited Dr. Thompson at The Pain Center for the first time in November 2015, and would continue to be treated by her for several years. Dr. Thompson took several approaches to managing Tenny's pain, including oral medication and transdermal medication. When these methods failed to work, Dr. Thompson referred Tenny to Dr. Calhoun, a psychiatrist, to determine

---

[1] Opioid-induced hyperalgesia is a condition experienced by some chronic users of opioids, where their perception of pain is actually increased by their use of opioids.

if Tenny was a candidate for a pain pump, a surgically implanted dispenser that delivers pain medication straight to the spinal fluid.[2] In April 2016, Tenny underwent a trial with an intrathecal pain pump. As a result of that procedure, a permanent intrathecal pain pump was placed two weeks later. Both Dr. Thompson and Tenny testified that the pain pump stabilized his pain levels without the adverse side effects accompanying oral or topical pain medication, although the left-sided groin pain has never resolved.

In December 2016, Tenny underwent an independent medical examination (IME) with Dr. Rodde Cox. Dr. Cox noted that it would be reasonable to order an MRI of the pelvis "to evaluate for any soft tissue structures that could be contributing such as an iliopsoas bursa." Dr. Cox's conclusion at that time was that "to a reasonable degree of medical certainty, there is causal relationship between [Tenny's] back and leg complaints and the reported injury" on the job.

On January 4, 2017, an MRI of the pelvis without contrast was performed. This MRI revealed "small to moderate left iliopsoas bursitis." Dr. Cox subsequently amended his IME to reflect that his medical opinion was that Tenny's pain was caused by left-sided bursitis, which was not caused by Tenny's December 2014 injury.

Although the Surety initially paid for Tenny's treatment, after Dr. Cox's IME was updated, the Surety concluded that Tenny was at maximum medical improvement and denied the remainder of his claim for medical treatment related to the left-sided hip pain. The Surety contended that Tenny's left-sided hip pain was not related to his on-the-job injury.

## B. Procedural History

On January 16, 2019, a hearing was conducted by Industrial Commission Referee Powers. The parties also submitted post-hearing briefs and conducted post-hearing depositions of Tenny's treating doctors. Referee Powers retired before a recommendation was issued and he was replaced by Referee Harper pursuant to a stipulation of the parties. Referee Harper considered the evidence submitted and rendered a recommended disposition. In sum, Referee Harper considered the depositions of

1. Tenny, taken April 13, 2017;
2. Dr. Cox, taken March 12, 2019;
3. Dr. Frizzell, taken February 28, 2019;
4. Dr. Gussner, taken March 11, 2019;

---

[2] This evaluation was deemed necessary considering Tenny's pre-existing risk factors for drug dependence.

4

5. Dr. Hajjar, taken March 14, 2019; and

6. Dr. Thompson, taken March 6, 2019.

Referee Harper also considered the testimony of Tenny, his wife Kristi, and Tenny's nurse case manager which was elicited at the hearing. Additionally, Referee Harper considered the exhibits consisting of Tenny's treatment records. Finally, Referee Harper considered Claimant's Exhibit A, which consisted of the case manager's notes.

Referee Harper characterized "[t]he question for resolution" as "whether [Tenny's] ongoing left-sided hip/groin pain is causally related to his industrial accident, including whether it is a compensable consequence of medical treatment provided to him for his accepted work injury." Referee Harper summarized the evidence presented, first noting that Dr. Frizzell and Dr. Thompson had provided medical opinions as to causation that were favorable to Tenny, i.e., that the second ESI caused nerve root dysfunction that resulted in pain into the left groin region. Dr. Frizzell's opinion focused on the potential for L3-4 radiculopathy to correspond with nerve pain in the groin area. Dr. Thompson opined that if bursitis were the primary cause of Tenny's pain, it would have been effectively addressed by anti-inflammatories, but this course of treatment had not worked for Tenny. Dr. Thompson admitted that there was no objective evidence to show the root of Tenny's pain but opined that "something happened" at this ESI to precipitate his pain, to a "highly likely" degree.

Referee Harper also noted that Dr. Schwartsman, Dr. Krafft, Dr. Hajjar, and Dr. Gussner provided opinions on causation favorable to the Defendants. Dr. Schwartsman provided a summary opinion letter from April 2017, after Tenny's second MRI of the pelvis, and agreed with the IME that the cause of Tenny's pain was likely the iliopsoas bursitis. Dr. Krafft, who conducted Tenny's initial nerve tests, opined that for the ESI to have caused Tenny's groin pain, the injecting doctor "would have had to miss by two levels to hit a nerve that would impact the groin because the groin is not in the nerve distribution for the L3-4." Dr. Hajjar's opinion noted that nerve damage caused by an injection would be immediate, rather than gradual, and noted that Tenny's subsequent nerve tests did not show any denervation that would be expected if there was nerve damage years previously. Dr. Hajjar admitted that bursitis could be discovered through a CT scan, ultrasound, or MRI, and that all scans prior to the January 2017 MRI of the pelvis did not reveal any bursitis.

Dr. Gussner opined that Tenny's pain was most likely caused by the iliopsoas bursitis. Dr. Gussner suggested that Tenny could have had tight hip flexors as a result of his prior left hip

5

replacement, and that lying in a prone position could have stretched the hip flexors, contributing to the bursitis. He admitted that he had ruled out bursitis when he gave Tenny two steroid injections in the bursae, but stated simply that he could have missed the bursae, as he did not use an ultrasound guided injection process but rather palpated Tenny and injected the tenderest spots. Dr. Gussner testified that the MRI was the only objective test imaging study explaining the location of Tenny's pain. He offered no explanation for why it had not been evident in any of the imaging that had been done before January 2017.

Finally, Dr. Cox provided testimony, in addition to his IME, that bursitis was the most likely cause of Tenny's pain. He noted that Tenny's pain worsened over time, rather than improving, and stated that nerve damage pain would be immediate, not gradual. He also admitted that Tenny's pain levels were high but suggested that this would be consistent with a somatic system disorder.

Referee Harper rejected the Defendants' argument that it was impossible to damage nerves affecting the groin with an L3-4 injection, noting that several doctors and a medical journal article established that it was possible for the L3 nerve root to innervate the area of Tenny's pain. While Referee Harper noted that neither Dr. Frizzell nor Dr. Thompson explicitly opined that the second ESI had impacted the left-sided nerves innervating Tenny's left groin, they did implicitly support that conclusion. Finally, Referee Harper reasoned that the "most compelling evidence in favor of causation" was the temporal relationship between the ESI and Tenny's symptoms, along with Tenny's testimony of a conversation with the anesthesiologist performing the injection.

Ultimately, Referee Harper found that not one specific doctor's opinion carried the most weight, "rather, when the evidence is pieced together from the various statements and admissions of the experts, the totality of the testimony and evidence supports the position of Dr. Thompson that 'something happened' at" Tenny's second ESI. Referee Harper noted that it was only after the January 2017 MRI that "at least two of the physicians who originally felt that [Tenny's] complaints were consistent with nerve damage" changed their opinions. "No expert gave a persuasive explanation for why, if [Tenny] had suffered from iliopsoas bursitis from the date of his second injection, it was not discovered for two years thereafter." Recognizing that the "weight of the decision rest[ed] primarily on a temporal relationship" between Tenny's onset of pain and the second ESI, Referee Harper noted that "any persuasive medical evidence in addition to a temporal

relationship may tip the scale in favor of causation, even when such opinion does not provide for the exact nature of the injury."

Referee Harper's recommended conclusion was that Tenny had proven "by a preponderance of the evidence that his left-sided groin condition is a causally related compensable consequence of treatment he received for injuries sustained as a result of his accepted industrial accident of December 2, 2014." The Industrial Commission subsequently adopted and confirmed Referee Harper's recommendation as its own.

The Defendants moved for reconsideration, arguing that the physicians opining in Tenny's favor based their opinions solely on Tenny's statements that the second injection precipitated the onset of pain, e.g., a temporal relationship and therefore an improper basis for their medical opinions. The Defendants argued that the referenced medical journal article "does not support a finding that it is possible to innervate a nerve in the left groin from a right-side injection."

The Industrial Commission denied the motion for reconsideration. The Commission stated that Tenny's testimony as to the onset of his pain was credible but conceded that the exact mechanical reasons for Tenny's pain—beginning after the second ESI—remained unclear. The Commission concluded that while the Referee could not ignore the compelling temporal relationship, this was not the only basis for his conclusion that something had occurred at the second ESI to cause Tenny's pain.

The Defendants timely appealed.

## II.    STANDARD OF REVIEW

When reviewing a decision of the Industrial Commission, this Court exercises free review over questions of law, but reviews questions of fact only to determine whether substantial and competent evidence supports the Commission's findings. Substantial and competent evidence is relevant evidence which a reasonable mind might accept to support a conclusion. It is more than a scintilla of proof, but less than a preponderance. All facts and inferences will be viewed in the light most favorable to the party who prevailed before the Industrial Commission.

*Morris v. Hap Taylor & Sons, Inc.*, 154 Idaho 633, 636, 301 P.3d 639, 642 (2013) (citation omitted).

"[T]his Court 'must liberally construe the provisions of the worker's compensation law in favor of the employee, in order to serve the humane purposes for which the law was promulgated.'" *Clark v. Shari's Mgmt. Corp.*, 155 Idaho 576, 579, 314 P.3d 631, 634 (2013) (quoting *Jensen v. City of Pocatello*, 135 Idaho 406, 413, 18 P.3d 211, 218 (2000)).

### III.    ANALYSIS

**A. The Industrial Commission applied the proper legal standards regarding causation.**

In his recommendations to the Industrial Commission, Referee Harper observed that a temporal relationship alone would not establish causation. (Citing *Seamans v. Maaco Auto Painting*, 128 Idaho 747, 751, 918 P.2d 1192, 1196 (1996)). Referee Harper nonetheless noted that "any persuasive medical evidence in addition to a temporal relationship may tip the scale in favor of causation, even when such opinion does not provide for the exact nature of the injury." Referee Harper concluded:

> In the present case, Dr. Hajjar's acknowledgment that significant pain directly at the time of the injection could support a causal connection, coupled with Dr. Gussner's opinion that some level of nerve damage might not be picked up on nerve studies, in addition to the opinions of Drs. Frizzell and Thompson, and more importantly [Tenny's] course of treatment over the intervening years provides the slight weight needed to tip the scale ever so minutely in [Tenny's] favor.

The Industrial Commission adopted these findings, and on the Defendants' motion for reconsideration the Commission reiterated the standard regarding causation and concluded that Tenny had met his burden.

On appeal, the Defendants argue that the Industrial Commission "recited the correct legal standards but then failed to follow them." The Defendants make three primary arguments: first, that the Commission failed to determine whether Tenny met his burden to prove causation "with a reasonable degree of medical probability" because the Commission erroneously applied the "preponderance of the evidence" standard; second, that the Commission failed to determine the weight to be given the medical expert opinions, instead forming its own medical opinion; and finally, that the Commission relied solely on the temporal onset of pain to find causation.

In response, Tenny argues that the Commission was free to look at the totality of the evidence when making its determination on causation, so long as this determination was supported by medical testimony. Tenny points out that physicians' opinions are only advisory. (Citing *Clark v. Truss*, 142 Idaho 404, 408, 128 P.3d 941, 945 (2006)). Tenny contends that the Defendants' position would raise the standard of proof from a reasonable degree of medical probability to that of "medical certainty," a standard rejected by this Court in *Bowman v. Twin Falls Construction Company*, 99 Idaho 312, 317, 581 P.2d 770, 775 (1978).

8

The Defendants counter, arguing first that the Industrial Commission erred by looking at the evidence as a *whole* to find causation based on a preponderance of the evidence, rather than a "reasonable degree of medical probability." Second, the Defendants argue that the Commission "cherry pick[ed] statements from various doctors to support its opinion" rather than relying on medical opinion. The Defendants contend that requiring the Commission to ground its analysis in medical opinion expressing a reasonable degree of medical probability does not change the standard of proof.

> "The claimant carries the burden of proof that to a reasonable degree of medical probability the injury for which benefits are claimed is causally related to an accident occurring in the course of employment." [*Hart v. Kaman Bearing & Supply*, 130 Idaho 296, 299, 939 P.2d 1375, 1378 (1997).] The issue of causation must be proved by expert medical testimony, *id.*, although the Industrial Commission as the finder of fact may consider other evidence as well, including evidence regarding credibility. *Soto v. Simplot*, 126 Idaho 536, 539–40, 887 P.2d 1043, 1046–47 (1994).

*Wichterman v. J.H. Kelly, Inc.*, 144 Idaho 138, 141, 158 P.3d 301, 304 (2007). "Medical testimony" includes both oral testimony from physicians and evidence from medical records or reports. *See Jones v. Emmett Manor*, 134 Idaho 160, 164, 997 P.2d 621, 625 (2000).

"Medical proof must establish such causal connection by a reasonable medical probability. The medical proof must establish a probable, not merely a possible, causal connection between the accident and the disability." *Green v. Columbia Foods, Inc.*, 104 Idaho 204, 205, 657 P.2d 1072, 1073 (1983) (citing *Bills v. Rich Motor Co., Inc.*, 96 Idaho 259, 526 P.2d 1095 (1974)). "No special verbal formula is necessary when . . . a doctor's testimony plainly and unequivocally conveys his conviction that events are causally related." *Jensen*, 135 Idaho at 412–13, 18 P.3d at 217–18 (citation omitted). Further, "[p]hysician opinions are not binding on the Commission but are advisory." *Dilulo v. Anderson & Wood Co.*, 143 Idaho 829, 831, 153 P.3d 1175, 1177 (2007) (citing *Jensen*, 135 Idaho at 412, 18 P.3d 217).

The Referee and the Commission applied the proper legal standard regarding causation. The Defendants have made much of the Commission's recitation of the "preponderance of the evidence" standard, and argue that the "preponderance" standard applies to a claimant's burden to show that an accident occurred during the course and scope of employment, while the "medical probability" standard governs the medical expert testimony. However, this Court has used the "preponderance of the evidence" standard interchangeably with the "reasonable degree of medical probability" standard due to the definition of "probable" in the context of medical expert testimony

in worker's compensation cases. For example, in *Stevens-McAtee v. Potlatch Corporation*, 145 Idaho 325, 332, 179 P.3d 288, 295 (2008), this Court reversed the Commission's determination that a claimant had not shown injury as a result of a compensable accident. This Court noted that, while a medical expert may be reluctant to couch an opinion in terms of a "reasonable degree of medical probability," it could "still be clear from his or her testimony that he or she considers that a claimant's injury *more likely than not* was caused by a work related accident." *Id.* at 334, 179 P.3d at 297 (italics added) (citing *Jensen*, 135 Idaho at 412, 18 P.3d at 217). Despite the Defendants' argument that the Commission conflated the two standards in evaluating the medical opinions, this Court has used the standards interchangeably when referring to medical expert testimony. *See id.*

To be sure, testimony proffered to a "reasonable degree of medical probability" must necessarily be rendered by someone within the medical profession, but it is still based on a more probable than not, or a preponderance of the evidence, basis. One standard describes the level of education and training undertaken by the medical professional, and the other describes the standard of proof for the fact-finder, but they are quantifiably the same (more likely than not). The Defendants' argument appears to be an attack on the weight and competency of the evidence, rather than the legal standards by which the evidence is measured.

The Defendants argue that the Commission "pieced" together its own medical opinion in violation of the requirement of medical proof as to causation. We recognize, as did the Referee and the Commission, that this was a close and difficult case. However, two physicians opined that Tenny's pain was causally related to the second ESI. The decisions below reflect significant analysis of the medical records and reports generated by physicians, and the Commission's approach to the many opinions may also be read as an attempt to analyze and reconcile the relative credibility of the opinions. *See Dilulo*, 143 Idaho at 831, 153 P.3d at 1177; *see also Lorca-Merono v. Yokes Washington Foods, Inc.*, 137 Idaho 446, 451, 50 P.3d 461, 466 (2002) (concluding that the Commission has authority to make its own determination as to the relative weight of expert opinions).

The Defendants also argue that the Commission primarily relied on Tenny's testimony, contending this was legal error because temporal relation alone cannot establish causation. The Defendants cite several Industrial Commission decisions to highlight this argument, and add that

10

this principle has also been utilized by this Court in civil cases.[3] (Citing *Coombs v. Curnow*, 148 Idaho 129, 141, 219 P.3d 453, 465 (2009) ("An expert's opinion does not meet the requisite standard of reliability when it is based on the mere temporal connection between the administration of a drug and a particular consequence.").) However, the Defendants' argument again focuses on the weight of the evidence to support the Commission's conclusion, rather than the standards used by the Commission. Referee Harper and the Commission were persuaded by the medical opinions that Tenny had established causation, and these medical opinions relied in part on Tenny's report of the onset of pain. Accordingly, a key factual question in this case was when Tenny's pain began. That the Commission made a finding as to this question and used it to support its ultimate conclusion does not change the fact that it recited and applied the rule that temporal relation alone would not establish causation. Accordingly, we are not persuaded that the Commission applied the wrong legal standards in its decision.

**B. Substantial and competent evidence supports the Commission's determination that Tenny established causation by a preponderance of the evidence through medical expert opinion to a reasonable degree of medical probability.**

The referee concluded that Tenny had "proven by a preponderance of the evidence that his left-sided groin condition is a causally related compensable consequence of treatment he received for injuries sustained as a result of his accepted industrial accident of December 2, 2014." Although the referee exhaustively analyzed the evidence available to him, his ultimate conclusion was reached through several key findings: (1) that it was possible for the L3 nerve root to innervate the area of Tenny's left-sided groin complaints; (2) that several physicians thought Tenny's complaints were consistent with nerve damage despite the lack of demonstrable evidence; (3) that confusion about when the pain initially set in could be explained by the role of the local anesthetic during Tenny's second ESI; and (4) that an injury during the ESI to the nerves innervating Tenny's left-sided groin could not be ruled out by the imaging that accompanied the ESI because they were only "point in time" images rather than video. The referee noted that the diagnostic testing that

---

[3] While the Industrial Commission decisions cited by the parties and by the referee and Commission below are not binding upon this Court, this rule is similar to this Court's rule as to medical experts. *Compare Boswell v. Edgewood Vista*, IIC 2015-033326 (March 15, 2019), para. 36 ("While a temporal relationship is always required to support a finding of causation between an accident and the injury, the existence of a temporal relationship alone, in the absence of substantive medical evidence establishing causation, is insufficient to satisfy Claimant's burden of proof"), *with Coombs v. Curnow*, 148 Idaho 129, 141, 219 P.3d 453, 465 (2009) (concluding that temporal causation was not basis of expert opinion when qualified expert was able to provide a scientific explanation of effect of administration of drug on decedent).

was performed did not reveal iliopsoas bursitis until January 2017, roughly two years after the ESI, and that the treatment Tenny underwent would be "overkill" for treatment of bursitis. In addition, the referee noted that the pain pump did not relieve Tenny's pain.

The referee's ultimate interpretation of the medical opinions was that if Tenny experienced immediate pain at the time of the second ESI, this would support a finding of a nerve injury. The referee found Tenny's testimony credible, calling Tenny's testimony "[b]y far the most compelling evidence in favor of causation." The referee concluded:

> In the present case, Dr. Hajjar's acknowledgment that significant pain directly at the time of the injection could support a causal connection, coupled with Dr. Gussner's opinion that some level of nerve damage might not be picked up on nerve studies, in addition to the opinions of Drs. Frizzell and Thompson, and more importantly [Tenny's] course of treatment over the intervening years provides the slight weight needed to tip the scale ever so minutely in [Tenny's] favor.

The referee's findings were adopted and again confirmed by the Commission in its order denying reconsideration: "At the end of the day we are left with the fact that the onset of [Tenny's] left groin discomfort coincides with the administration of the injection."

On appeal, the Defendants argue that the Commission's finding of causation is unsupported by substantial and competent evidence. In particular, the Defendants contend that "the evidence lacks any objective foundation upon which a finding of causation can reasonably be based." The Defendants assert that Dr. Frizzell and Dr. Thompson did not point to any objective evidence to support their conclusion that Tenny's groin pain was from nerve damage. The Defendants maintain the objective evidence shows that the groin pain was *not* caused by nerve damage: (1) imaging of the injection, (2) the outcome of Tenny's decompression surgery, (3) physical findings from treating doctors and during the IME, and (4) the nerve conduction studies. Instead, the Defendants contend, the only objective evidence of the cause of Tenny's condition is the MRI of the pelvis performed January 2017, showing iliopsoas bursitis.

In response, Tenny argues that the Commission did not rely on temporal relation alone and sets out at length the opinions expressed by his several doctors (including Dr. Hajjar and Dr. Gussner) as treatment unfolded. Tenny reasons that this medical testimony made it important for the Commission to determine *when* exactly his left-sided groin pain began. Tenny urges this Court to "reject the notion that there has to be objective evidence to support causation[,]" arguing that "there are some injuries that medical objective testing is not adequate enough to detect."

The Defendants respond by arguing that Tenny misconstrues the medical records because the medical records actually show "a lack of objective evidence of nerve damage[.]" The Defendants reason that "requiring medical opinions to be supported by objective evidence is consistent with requiring something more than a possibility." The Defendants reiterate that the medical experts supporting Tenny's claim did not render opinions based on objective evidence and characterize the opinions of Dr. Frizzell and Dr. Thompson as "unsubstantiated conjecture." The Defendants assert that the Commission "took great liberty in utilizing isolated statements by Dr. Hajjar and Dr. Gussner even though the actual opinions by those providers is that the right-sided injection did not cause the left-sided groin pain."

> The Commission is free to determine the weight to be given to the testimony of a medical expert. *Lorca–Merono*[, 137 Idaho at 452, 50 P.3d at 466]. We will not disturb the Commission's conclusions as to the weight and credibility of expert testimony unless such conclusions are clearly erroneous. *Id.*

*Anderson v. Harper's Inc.*, 143 Idaho 193, 197, 141 P.3d 1062, 1066 (2006). "On appeal, this Court is not to re-weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented." *Id.* (citing *Warden v. Idaho Timber Corp.*, 132 Idaho 454, 457, 974 P.2d 506, 509 (1999)).

We conclude that the Commission's determination is supported by substantial and competent evidence. First, while the Defendants argue that the Commission depended on several non-expert findings to support its conclusion, it is clear that Tenny had two medical expert opinions stating that Tenny's groin condition arose from whatever occurred during the second ESI. We are not persuaded, as argued by the Defendants, that Dr. Frizzell somehow withdrew his opinion by acknowledging that the studies he cited were not entirely on point. The referee acknowledged the point for which Dr. Frizzell cited those studies, i.e., that L3-4 radiculopathy could account for groin pain, and that the nerve conduction studies would not assess nerve pain, only dysfunction/damage. Dr. Frizzell's medical opinion by itself constitutes far more than a scintilla of evidence to support the Commission's decision.

Second, the Commission's decision is not rendered clearly erroneous by the lack of objective evidence to establish the exact mechanism of Tenny's symptomology. *See Anderson*, 143 Idaho at 197, 141 P.3d at 1066. In *Anderson*, the claimant underwent cervical fusion surgery related to an industrial accident. *Id.* at 195, 141 P.3d at 1064. Almost immediately after the surgery, the claimant developed tremors in his hands and arms, making it difficult for him to grasp and hold

13

objects. *Id.* The claimant then underwent a battery of treatment and testing as doctors strained to determine the cause of his tremors. *Id.* at 196, 141 P.3d at 1065. One of the claimant's treating doctors sent the claimant for other testing, prescribed medication that did not control the tremors, ruled out several explanations, and stated, "[t]he mechanism of the upper arm symptoms is still not clear but does appear to relate to problems in the back." *Id.* The Commission ultimately relied on this doctor's reports to conclude that the tremors were causally related as a compensable consequence of the claimant's treatment. *Id.*

On appeal, this Court affirmed, commenting, "[t]aken in context, the Commission did not err in interpreting this statement as an expression of a medical probability rather than merely a medical possibility. The words 'not clear' related to the exact mechanism of causation, not to the fact of causation." *Id.* at 197, 141 P.3d at 1066. In *Anderson*, despite a lack of objective evidence as to what occurred at the cervical fusion surgery and what mechanism caused the tremors, this Court affirmed the Commission's determination that the treating doctor's opinion established causation. Here, while there is objective evidence in the form of the January 2017 MRI showing iliopsoas bursitis, Dr. Frizzell was unconvinced that this imaging—two years after the fact— explained the pain that occurred immediately after the second ESI.

Third, this Court has found that causation was established even where expert physicians expressed uncertainty about the ultimate cause of the injury, but where alternative causes were ruled out and where great weight was placed on the claimant's testimony of temporal relation. *See, e.g.*, *Anderson*, 143 Idaho at 197, 141 P.3d at 1066; *and Jensen*, 135 Idaho at 413, 18 P.3d at 218. In *Jensen*, the claimant suffered a medical reaction after ingesting pain medication provided by his supervisor (which was subsequently discarded before it could be tested), and then experienced total renal failure two days after this reaction. 135 Idaho at 407, 18 P.3d at 212. The Industrial Commission concluded that while the medical reaction was causally related to the claimant's work, his subsequent renal failure was not. *Id.* at 408–09, 18 P.3d at 213–14. The parties cross-appealed. This Court noted that a physician had provided deposition testimony that alternative explanations had been ruled out:

> Q. In the inquiry, the index of suspicion requires that we say whatever was in there has got to be right on the top of our list because of the sequence of events; right?
> A. I'm trying to be exactly correct in how I answer that. In the list of my speculation of what might have caused the renal failure, then it would be at the top of that list of my speculation. *I don't know of anything that would be higher*, but I have no evidence to support that it was the cause.

Q. That's right. That's right. Nobody does, and nobody will if the medication was all destroyed?
A. I think that's probably fair. That's correct.

*Jensen*, 135 Idaho at 410, 18 P.3d at 215 (italics in original).

This Court ultimately affirmed the Commission's conclusion that the medical reaction was causally related to the claimant's work, pointing to non-expert testimony of the claimant's supervisor, the closeness in time between ingesting the pain medication, and the physician's testimony that he knew of nothing that would be higher on his list of speculation. *See id.* at 411, 18 P.3d at 216 ("Therefore, while perhaps the evidence does not overwhelmingly establish a definite causal link between the Pain-Off ingestion and Jensen's renal failure, it does provide substantial and competent evidence to support the referee's finding of fact number 37."). Notably, this Court reversed the Commission's conclusion that the subsequent renal failure was not related:

> [W]hile Dr. Hearn expressly refused to say the words "reasonable degree of medical probability," it is clear from his testimony that he considered that Jensen's renal failure to be more likely than not caused by his ingestion of Pain-Off . . . . Therefore, we hold that Dr. Hearn's testimony, coupled with the facts, adequately established a causal connection between Jensen's Pain-Off ingestion and his renal failure, when Dr. Hearn indicated that he did "not know of anything that would be higher" on his list of speculation.

*Id.* at 412–13, 18 P.3d at 217–18.

Similarly, as discussed above, this Court in *Anderson* affirmed the Commission's finding of causation, noting that

> [t]here were other facts supporting the Commission's finding of causation. Claimant testified that the tremors began "almost immediately right after surgery," while he was still in the hospital; that he experiences a burning sensation in his neck signaling the onset of the tremors; and that there was no evidence of any other cause of the tremors.

*Anderson*, 143 Idaho at 197, 141 P.3d at 1066.

Here, the Commission's conclusion that there was a causal link between Tenny's second ESI and his intractable groin pain is supported by substantial and competent evidence. First, the Commission's conclusion is supported by medical testimony to a reasonable degree of medical probability. Second, the non-opinion evidence also supports this conclusion. Objective evidence of what *could* cause similar pain—e.g., iliopsoas bursitis—did not emerge until two years *after* the onset of pain. Dr. Thompson and Dr. Frizzell noted that pain associated with iliopsoas bursitis should have responded to Tenny's course of treatment, whereas his pain was abated only by the

15

pain pump, which to both doctors suggested neuropathic issues. The Referee and Commission clearly rejected the Defendants' position that iliopsoas bursitis began immediately after the second ESI but was not detected by a CT scan, or treated by a treatment plan which should have alleviated his pain, and that two injections performed by Dr. Gussner missed the bursae entirely or provided no relief for the purported bursitis.

We recognize that the Commission uses several qualifiers in describing the weight of the evidence. The Commission also pointed to several other facts not relied upon by any of the physicians in establishing their medical opinions, e.g., that Tenny's pain levels immediately after the second ESI could have been affected by the local anesthesia, or that the fluoroscopic imaging was point-in-time. We note that such reliance invited appeal. However, the Commission's conclusion ultimately rested on Dr. Thompson's and Dr. Frizzell's opinions, as corroborated and substantiated by Tenny's testimony about the timing of the onset of his groin pain. In light of the deference owed to the Commission's findings of fact, and because the Commission was persuaded by medical opinions rendered to a reasonable degree of medical probability, we affirm. *See Anderson*, 143 Idaho at 197, 141 P.3d at 1066; *Jensen*, 135 Idaho at 413, 18 P.3d at 218.

### C. Tenny's additional issue is rendered moot because this Court is affirming the Commission's decision.

The referee found that Dr. Thompson had not reviewed any documentation from other physicians before reaching her conclusion that Tenny's pain was a result of something occurring at the second ESI. Tenny has raised an additional issue on appeal, arguing that this finding is clearly erroneous. In response, the Defendants argue that if Tenny seeks any affirmative relief through this additional issue, Tenny should have filed a cross-appeal.

Idaho Rule of Appellate Procedure 15(a) states:

> **Right to Cross-Appeal.** After an appeal has been filed, a timely cross-appeal may be filed from any interlocutory or final judgment or order. If no affirmative relief is sought by way of reversal, vacation or modification of the judgment or order, an issue may be presented by the respondent as an additional issue on appeal under Rule 35(b)(4) without filing a cross-appeal.

I.A.R. 15(a). "In Idaho, a timely notice of appeal or cross-appeal is a jurisdictional prerequisite to challenge a determination made by a lower court. Failure to timely file such a notice shall cause automatic dismissal of the issue on appeal." *Hamilton v. Alpha Servs., LLC*, 158 Idaho 683, 693, 351 P.3d 611, 621 (2015) (quoting *Miller v. Bd. of Trustees*, 132 Idaho 244, 248, 970 P.2d 512, 516 (1998) (internal quotation marks omitted)).

16

Although the Commission's conclusion that Dr. Thompson reviewed no documentation from other physicians before reaching her opinion is contradicted by Dr. Thompson's own deposition, it is unnecessary for this Court to rule on the question Tenny has raised because we are affirming the Commission's decision. We are not modifying the Commission's decision, and Tenny has ultimately prevailed.

**D. No attorney fees will be awarded.**

On appeal, Tenny seeks an award of attorney fees under Idaho Code section 72-804, arguing that his employer appealed to this Court "without any reasonable basis." Tenny asserts that this Court is being asked to reweigh the evidence "under the guise of a misapplied standard of law." In response, the Defendants contend that it has a reasonable ground for an appeal, because the Industrial Commission failed to follow the proper legal standards for reaching a decision. (Citing *Aguilar v. Indus. Special Indem. Fund*, 164 Idaho 893, 899, 436 P.3d 1242, 1248 (2019)).

Idaho Code section 72-804 allows for an award of attorney fees where a court "determines that the employer or his surety contested a claim for compensation made by an injured employee . . . without reasonable ground[.]" I.C. § 72-804. This Court has declined to award attorney fees to a claimant-respondent under section 72-804 even where the proper legal standards were followed by the Commission and where substantial and competent evidence supported the Commission's decision, in light of a close evidentiary call made by the Commission. *See Seamans*, 128 Idaho at 754, 918 P.2d at 1199.

Here, the Commission observed this case presented a close evidentiary call. The decisions of the referee and the Commission reflect a significant amount of qualifying language in their interpretation of the evidence. Although the Commission followed the appropriate legal standards, it used equivocal language which invited appeal. The Defendants have not pursued their appeal frivolously, so attorney fees will not be awarded to Tenny.

### IV.    CONCLUSION

For the foregoing reasons, this Court affirms the decision of the Industrial Commission. No attorney fees are awarded on appeal. Costs, as a matter of right, are awarded to Tenny.

Chief Justice BEVAN, Justices BURDICK, BRODY, and MOELLER CONCUR.

17